No. 93-535

IN THE SUPREME COURT OF THE STATE OF MONTANA

1994

BONNIE MARTINELL,

    Plaintiff and Respondent,

-v-

MONTANA POWER COMPANY,
a Montana Corporation,

    Defendant and Appellant.

FILED

DEC 15 1994

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:   District Court of the Sixteenth Judicial District,
In and for the County of Rosebud,
The Honorable Joe L. Hegel, Judge presiding.


COUNSEL OF RECORD:

    For Appellant:

    Patrick T. Fleming, Butte, Montana

    For Respondent:

    Rosemary Boschert, Billings, Montana


Submitted on Briefs:   October 13, 1994

Decided:   December 15, 1994

Filed:

_____
Clerk

Justice Fred J. Weber delivered the Opinion of the Court.

Defendant Montana Power Company appeals the decision of the District Court of the Sixteenth Judicial District, Rosebud County, in an action claiming discrimination based on handicap and constructive discharge from employment. After a nonjury trial, the District Court ruled in favor of Montana Power Company, concluding that the defendant had no duty to accommodate a handicapped person under the law in effect when Bonnie Martinell terminated her employment with defendant. The District Court reversed that ruling on plaintiff's Motion to Alter or Amend Findings of Fact, Conclusions of Law and Judgment, concluding that defendant did have a duty to reasonably accommodate Bonnie Martinell. The District Court awarded damages for past and future loss of wages in the amount of $467,364. We affirm.

The issues are restated as follows:

I. Did the District Court err in concluding that Bonnie Martinell was a "handicapped" person according to the Montana Human Rights Act?

II. Did the District Court err in concluding that the pre-1991 version of § 49-2-303(1)(a), MCA, imposed a duty of reasonable accommodation on Montana Power Company?

III. Did the District Court err in concluding that Bonnie Martinell had been constructively discharged by Montana Power Company?

IV. Did the District Court err by awarding $467,364 in damages to Bonnie Martinell?

2

Bonnie Martinell (Martinell) was employed by defendant Montana Power Company (MPC) as a Chemical Laboratory Technician in MPC's Colstrip Units No. 1 and No. 2 from April 21, 1981, through September 6, 1984. She previously worked as an Environment and Range Technician for Western Energy Corporation, one of MPC's wholly-owned subsidiaries.

As a lab technician for MPC, Martinell performed chemical analyses, trouble-shooting and chemical treatment on water, coal and scrubber systems. Initially, all the employees in the Chemical Lab worked day shifts. At some point in 1983, she and other lab technicians working in the Chemical Lab began working rotating shifts in an effort to cut down on overtime. The shift rotation schedule covered the hours from 6:00 a.m. until midnight and eliminated much of the overtime for all employees in the Chemical Lab.

During the summer of 1981, Martinell's physician had diagnosed her as suffering from endometriosis, a disease affecting the female reproductive system whereby uterine tissue detaches from the uterus and becomes attached to other body tissues and organs. From 1981 through her termination of employment in September of 1984, and beyond, Martinell was treated for endometriosis, with her condition worsening over time. The medical treatment she received included medications which caused depression. These medications included Danocrine and Provera. Endometriosis can abate during a pregnancy and Martinell experienced an improvement in her condition during a pregnancy in 1983.

3

After giving birth to her first child in August of 1983, Martinell's endometriosis symptoms resurfaced and she again took medication for pain and other symptoms, which in turn caused a recurrence of the medication induced depression. She also experienced unusual neurological symptoms of unknown cause. Dr. Rauh, her gynecologist, advised her that the only definitive cure for her endometriosis was a complete hysterectomy. Martinell did not want a hysterectomy at that time because she hoped to have more children. Because of the endometriosis, Martinell missed numerous days of work for which she received sick pay. This eventually placed her job in jeopardy due to excessive absenteeism.

The disease worsened and after discussing medical options with Martinell in early 1984, Dr. Rauh suggested that she try to arrange her work scheduling to more regular hours. He offered to write a letter explaining the reasoning for this, if necessary. Martinell then discussed the matter with co-workers to find out whether it would cause them problems if she were to request day shifts. In April of 1984, Martinell requested that Dr. Rauh write a letter on her behalf in support of changing her shifts. Dr. Rauh wrote a letter addressed "to whom it may concern," stating that Martinell would be "greatly benefitted medically by regular working hours not to exceed 40 per week" to allow normal sleep patterns and to minimize other symptoms of her endometriosis. Dr. Rauh stated further that a more "normal" schedule for sleeping would eliminate stress which tends to worsen endometriosis.

Martinell presented this letter to her supervisor along with

4

her request for day shifts. Her request for straight day shifts was denied despite the fact that at least one fellow employee, Becky Dodd, offered to trade her day shift for Martinell's afternoon shift. The testimony indicates that MPC did not ask other employees if they were willing to work alternate schedules to accommodate Martinell's request for day shifts.

Martinell appealed the denial of her request for day shifts to MPC's corporate Manager of Personnel Relations. Subsequently, several male managers met with Martinell to discuss the appeal. After the meeting, Martinell provided them with additional medical information from her physicians to further substantiate her need for a regular schedule. Dr. Dale Peterson, a Billings neurologist, wrote a letter to Martinell, stating:

> We have not been able to make a definite diagnosis regarding your [neurological] symptoms, but feel that working excessively long hours and frequent changes in shift add fatigue which seems to exacerbate your symptoms. If it would be possible for you to work a straight daytime shift it would be likely that you would notice some improvement in the way you feel.

Dr. Rauh included this information in his letter to MPC. Again, Martinell's request was denied. She was advised that this decision was final and that the matter would "not be reconsidered under present conditions."

After the final decision, Dr. Rauh sent another letter along with one of MPC's "Attending Physician Disability Statements." Dr. Rauh verified that while Martinell suffered from endometriosis and medication induced depression, she could continue to perform the same technical duties but should have regular work hours. MPC

5

refused to reconsider its previous final decision.

As mentioned above, Martinell had taken numerous sick days because of her illness. In mid-August of 1984, after taking off yet another sick day, John Walker, her supervisor, called her at home and advised her she could not return to work without a written excuse from her doctor. She advised him Dr. Rauh was out of town for the rest of August and that she would be unable to get him to provide her with this documentation. When Walker refused to allow her to come back without her doctor's written excuse, Martinell called MPC's highest-ranking official in Colstrip to ask him if she could be allowed to return to work without the written note from Dr. Rauh. This official overruled Walker and specifically told Martinell to return to work and to disregard Walker's orders.

On the day she returned to work, Walker would not speak to her. She then submitted her letter of resignation on August 22, 1984, to be effective on September 6, 1984. Martinell was unaware at the time she severed her employment that she was again pregnant; she gave birth to her second child in May of 1985. Subsequently, in November of 1986, she underwent a complete hysterectomy because the endometriosis worsened after the birth of her second child. Although she is not wholly free of neurological symptoms, the 1986 surgery nearly eliminated her physical symptoms caused by the endometriosis and totally eliminated the need for medication.

After the nonjury trial in this action, the District Court determined that MPC had constructively discharged Martinell and had discriminated against her on the basis of her physical handicap.

6

Although the court determined that Martinell was a "handicapped" person according to the Montana Human Rights Act, § 49-2-101(16), MCA (1983), and that MPC had discriminated against her and had failed to recognize that she qualified as a handicapped person, the court initially ruled that MPC did not have a duty to make a "reasonable accommodation" for her handicap under the law in effect in 1984. The District Court noted that the 1991 Montana Legislature had modified § 49-2-101(16), MCA, to add the requirement of "reasonable accommodation" effective October 1, 1991, and that no such duty had been required under the pre-1991 law. The court stated:

> If MPC had a duty of reasonable accommodation, the Court would have conclude[d] that the resulting discrimination placed Bonnie Martinell in an untenable situation, and, although there were other possible alternatives available to Bonnie Martinell, none of these alternatives would be considered reasonable by the Court.
> . . .

Pursuant to the Martinell's post-trial Motion to Alter or Amend Findings of Fact, Conclusions of Law and Judgment, the District Court reversed its previous holding and concluded that MPC did indeed have a duty to make a reasonable accommodation for Martinell's physical handicap because the pre-1991 version of § 49-2-303(1)(a), MCA, impliedly imposed a duty of reasonable accommodation on MPC. In this second Judgment granting Martinell's post-trial motion, the District Court adopted as findings those findings made conditional on a finding of a duty of reasonable accommodation, including the finding quoted above. Thus, the District Court's extensive findings of fact which had no effect

7

without a duty of reasonable accommodation, were particularly incorporated into and given effect in the final judgment in Martinell's favor.

Further facts are provided as necessary throughout this opinion.

## ISSUE I

Did the District Court err in concluding that Bonnie Martinell was a "handicapped" person according to the Montana Human Rights Act?

The District Court concluded that Martinell was a "handicapped" person within the meaning of the Montana Human Rights Act. MPC contends that the District Court erred as a matter of law in ruling that Martinell's condition constituted a handicap. As a matter preliminary to our discussion on this issue, we first note that the Montana Legislature has changed the terminology under the Montana Human Rights Act so that the term "handicap" has been changed to the word "disability." See § 49-2-101(15)(a), MCA (1993). Under the law in effect in 1984, however, "handicap" was the appropriate terminology and we will use that term throughout this opinion.

Section 49-2-101(16), MCA (1983), in effect at the time of Martinell's termination of her employment, provided as follows:

> **49-2-101. Definitions.** As used in this chapter, unless the context requires otherwise, the following definitions apply:
>
> . . . .
>
> (16) "Physical handicap" means a physical disability, infirmity, malformation, or disfigurement which is caused by bodily injury, birth defect, or illness, including epilepsy. It includes without

8

limitation any degree of paralysis; amputation; lack of physical coordination; blindness or visual impediment; deafness or hearing impediment; muteness or speech impediment; or physical reliance on a guide dog for the blind, a wheelchair, or any other remedial appliance or device.

The Montana Human Rights Commission had further interpreted the statutory definition as follows:

The terms "mental handicap" and "physical handicap" shall have meanings stated in section 49-2-101, MCA, with the following clarifications:

(a) A "handicapped individual" is a person who

(i) has a physical or mental handicap which substantially limits one or more of such person's major life activities, . . .

24.9.801(3), ARM. This interpretation of the definition of "handicapped individual" is the same as the definition in 29 U.S.C.A. § 706(8)(B) (West Supp. 1994). Guidelines from federal enforcement agencies addressing this definition provide that a condition will be considered a handicap if it constitutes a "medically recognized condition" rather than a general physical characteristic and may be a physical disorder, a cosmetic disfigurement, or an anatomical loss affecting the neurological, musculoskeletal, special sense organs, respiratory, cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, or endocrine body systems. 45 C.F.R. § 84.3(j)(2)(i) (1993). It also may be a mental or psychological disorder including emotional or mental illness. 29 C.F.R. § 1613.702(b)(2) (1993).

The Montana Human Rights Commission is a quasi-judicial board which has been given rulemaking authority by the Montana Legislature to adopt rules necessary to implement the Montana Human

9

Rights Act. See §§ 2-15-1706, MCA; and 49-2-204, MCA. This Court gives deference to interpretations of the Montana Human Rights Commission concerning the laws which it enforces. Link v. City of Lewistown (1992), 253 Mont. 451, 454, 833 P.2d 1070, 1072, citing Harrison v. Chance (1990), 244 Mont. 215, 220, 797 P.2d 200, 203. Therefore, the administrative rule clarifying § 49-2-101(16), MCA (1983), has substantive effect here in determining whether Martinell qualified as a handicapped person under § 49-2-101(16), MCA (1983).

MPC contends that Martinell's endometriosis and medication induced depression did not satisfy the "substantially limited" standard set forth in 24.9.801(3), ARM, reasoning that her condition was at all times curable by means of a hysterectomy, and that the curable character of her illness defies classification as a handicap because her activities were limited only to the extent she wished them to be limited. MPC further contends that her choice of living with the symptoms rather than opting for the surgical cure falls short of the condition being a substantial limitation on a major life activity. Further, MPC maintains that she had the remedy of abating her symptoms temporarily by becoming pregnant as an alternative to a hysterectomy or drug therapy.

The District Court found these arguments "untenable" and the alternatives suggested by MPC "unreasonable." The court concluded that Martinell was "'handicapped' within the meaning of Montana law in that the endometriosis coupled with medication induced depression substantially limited a major life activity, namely, her

10

work" and that it qualified as handicapped under the statutory definition as an "infirmity" caused by illness. MPC contends that the District Court erred as a matter of law in concluding that Martinell was a "handicapped person."

We review a district court's conclusions of law to determine whether they are correct. Steer, Inc. v. Department of Revenue (1990), 245 Mont. 470, 474-75, 803 P.2d 601, 603. This issue is one of first impression for this Court. In reviewing such cases to determine whether the court correctly interpreted the applicable law, we may properly look to interpretations under similar acts from other jurisdictions. We have previously stated that "reference to pertinent federal case law is both useful and appropriate" in an action charging discrimination in which we referred to Title VII of the Civil Rights Act of 1964. Snell v. Montana-Dakota Utilities Co. (1982), 198 Mont. 56, 62, 643 P.2d 841, 844. See also, Martinez v. Yellowstone County Welfare Dept. (1981), 192 Mont. 42, 47, 626 P.2d 242, 245. The Montana Human Rights Act, Title 49, MCA, is closely modeled after Title VII of the federal Civil Rights Act of 1964 and, more pertinent here, the Rehabilitation Act of 1973, 29 U.S.C.A. §§ 701, et seq. (West 1985 & Supp. 1994), which relates to handicap discrimination.

The first element to be addressed in this issue is whether the court correctly determined as a matter of law that Martinell's illness--endometriosis coupled with medication induced depression--caused an "infirmity." Secondly, we review whether the court correctly concluded that the "infirmity" substantially limited a

11

major life activity. From the materials submitted in this case by *amicus curiae* Montana Human Rights Commission, it is apparent that the Commission applies the definition of handicap from § 49-2-101, MCA, and the clarifying definition from 24.9.801(3), ARM, in deciding questions as to what constitutes a handicap.

It is further evident that this specific issue apparently has not been addressed by the Montana Human Rights Commission in any of its appeals, although the Commission has ruled, and we agree, that work is a "major life activity." "Major life activities" include the ability to communicate, socialize, care for one's self, perform manual tasks, walk, see, hear, speak, breathe, learn and work. 29 C.F.R. § 1613.702(c) (1993); 41 C.F.R. § 60-741, App. A (1993); 28 C.F.R. § 41.31(2) (1994); 34 C.F.R. § 104.3(j)(2)(ii) (1993); and 45 C.F.R. § 84.3(j)(2)(ii) (1993).

The Commission determines what constitutes a handicap using a case-by-case method, as do the majority of state and federal courts. See 3A A. Larson, Employment Discrimination § 106.14 (1994). Dr. Rauh testified that endometriosis is a "progressive disease" which is known to cause numerous symptoms depending on where in the body it is located and the structures to which it has attached, but the three primary symptoms are pain, abnormal bleeding and infertility. He testified that, at its worst, and if left untreated, the disease can cause ovarian tumors which have a tendency to become malignant. It can also result in appendicitis, bowel and urinary tract obstructions and it can affect the central nervous system with nerve damage caused by pain and signs of

12

meningitis. Dr. Rauh prescribed Danocrine and later Provera for Martinell's symptoms. These drugs were effective in treating her endometriosis symptoms but caused depression which could not be treated by anti-depressant drugs or psychotherapy.

Under § 49-2-101(16), MCA (1983), an illness or disease which causes an "infirmity" constitutes a handicap. An "infirmity" is defined as "an unsound or unhealthy state of body." Webster's New Twentieth Century Dictionary 939 (2d ed. 1979). Clearly, Martinell's disease meets the plain meaning of the word "infirmity" by causing an unhealthy body state, not only directly, but also secondarily from the medication used to treat her endometriosis. We conclude the District Court correctly ruled that endometriosis constituted an "infirmity" under § 49-2-101(16), MCA (1983).

Next, we address whether Martinell's condition also meets the expanded clarification of "handicap" under the administrative rule because it is not clearly evident that endometriosis can be considered a physical handicap in each case, as its assortment of symptoms is likely to affect each patient in a unique manner. The District Court determined that Martinell could still perform her job, although her ability to do her job was substantially limited by pain which could be minimized by having a regular work schedule.

We are not the first court to consider whether the disease of endometriosis constitutes a handicap. In determining that Martinell was a handicapped individual, the District Court relied on Illinois Bell Tel. Co. v. Human Rights Comm'n (Ill. App. 1989), 547 N.E.2d 499, appeal denied, 550 N.E.2d 556. Illinois Bell

13

addressed a situation strikingly similar to the case before us. The plaintiff there also suffered from endometriosis and, like Martinell, was treated with Danocrine. She worked in a unit for a number of years where employees worked under a somewhat flexible shift system which allowed her to schedule her working days so that she minimized the number of sick days that she needed to take off. She later transferred to another unit with similar work. That unit did not permit the flexible scheduling and the employee's condition resulted in many more sick days being taken, placing her job in jeopardy due to excessive absenteeism. She was not allowed to transfer to another unit where she could schedule around her condition because the company job transfer policy did not allow employees with excessive absenteeism to transfer.

The court interpreted Illinois' definition of "handicap" in the Illinois Human Resource Act to include endometriosis as applied to the plaintiff in Illinois Bell, distinguishing it from another Illinois case which determined that dysmenorrhea (painful menstruation) was not a handicap. The Illinois Act is substantively similar to the Montana Human Rights Act for discrimination based on handicap. Both the Illinois and Montana Human Rights Commissions have construed handicap to include persons whose conditions hinder them from engaging in "major life activities" and to include employment as a major life activity. Illinois Bell, 547 N.E.2d at 506.

In its analysis of whether the disease endometriosis constituted a handicap, the Illinois court looked to the purpose of

the Illinois Human Resource Act and determined that the plain language of the statute, together with the Illinois Human Rights Commission's rules on handicap discrimination in employment, clearly included the disease of endometriosis. Illinois Bell, 547 N.E.2d at 506. Under the Illinois Human Resource Act, the term "handicap" included physical and mental conditions which were temporary and was not confined to conditions which are grave and extreme in nature. The court interpreted the Illinois Act to exclude conditions which are transitory and insubstantial, such as influenza or a cold, and conditions that are disfiguring. Illinois Bell, 547 N.E.2d at 506.

The court further stated that, to constitute a handicap, a condition must be determinable by recognized diagnostic techniques. Illinois Bell, 547 N.E.2d at 506. The Illinois Bell court concluded that the Illinois Human Rights Commission correctly construed the definition of "handicap" as applying to endometriosis. The employee underwent a laparoscopy and the disease of endometriosis was determined to be the cause of her symptoms. In applying its rules on handicap discrimination, the Commission concluded that the employee was in fact handicapped. Illinois Bell, 547 N.E.2d at 506-07.

In affirming the Illinois Human Rights Commission's interpretation, the court concluded that the determination of handicap must be made on a case-by-case basis and provided the following caveat:

> We are mindful of the plight of the large number of women who are afflicted by severe menstrual pain, and we

15

recognize that all such conditions are not necessarily physical handicaps, but must be determined from the facts of each case. We are also aware of the intent of the legislature to protect only those who are handicapped within the meaning of the Act.

Illinois Bell, 547 N.E.2d at 507.

In this case, where the Illinois law is similar to federal law and Montana law, the District Court properly looked to Illinois law in determining whether the disease of endometriosis constituted a handicap. Illinois Bell is part of the nationwide body of case law interpreting discrimination statutes. We agree with the Illinois court's analysis and conclude that the District Court correctly determined that Martinell's endometriosis, coupled with her medication induced depression, substantially limited her employment.

"Substantially limits," as applied in this case, relates to the effect of the handicap on employment. A person is substantially limited if he or she experiences difficulty in securing, retaining, or advancing in employment. 41 C.F.R. § 60-741 App. A (1993). The record clearly supports the District Court's finding that Martinell's endometriosis substantially limited her work as evidenced by her absenteeism related to the condition. The record indicates that she not only had difficulty in retaining employment, but that she also had difficulty in advancing in employment.

During her employment with MPC, Martinell applied for, but was not given, the position of Chemical Lab Supervisor as well as other positions within MPC. The lab supervisor position was first filled

16

with a male employee trained by Martinell who subsequently vacated that position after a short time. The position opening was then left open until after Martinell terminated her employment with MPC. It had remained unfilled for some time and Martinell testified she was told that a man had to be placed in that position. She provided testimony indicating that she had trained new employees as lab technicians and had done other work which a lab supervisor would ordinarily perform.

We conclude that the facts of this case support the District Court's conclusion that endometriosis was a handicap which substantially limited Martinell's employment, a major life activity. We further conclude that a handicap determination based on illness under the Montana Human Rights Act is properly made using a case-by-case analysis.

We hold the District Court correctly classified Martinell as a "handicapped" person under the Montana Human Rights Act.

## ISSUE II

Did the District Court err in concluding that the pre-1991 version of § 49-2-303(1)(a), MCA, imposed a duty of reasonable accommodation on Montana Power Company?

MPC contends that even if Martinell qualifies as a handicapped person, an employer such as MPC had no duty to accommodate her handicap under the law in effect in 1984. MPC relies on the express language of § 49-2-303(1)(a), MCA (1983), which provided:

**Discrimination in employment.** (1) It is an unlawful discriminatory practice for:

(a) an employer to refuse employment to a person, to bar him from employment, or to discriminate against him in compensation or in a term, condition, or privilege of

17

employment because of his race, creed, religion, color, or national origin or because of his age, physical or mental handicap, marital status, or sex when the reasonable demands of the position do not require an age, physical or mental handicap, marital status, or sex distinction;

. . . .

(2) The exceptions permitted in subsection (1) based on bona fide occupational qualifications shall be strictly construed.

MPC argues that § 1-2-101, MCA, which speaks to the role of a judge in construing statutes, is a limitation on a district court's right to read more into a statute than is expressed by the legislature. MPC's argument centers on making a determination of legislative intent from the plain meaning of the words used. MPC contends that the District Court cannot look to legislative intent when the express terms of the statute are clear and unambiguous. It insists that the pre-1991 text of § 49-2-303(1)(a), MCA, contained no reference to accommodating a handicapped person and, therefore, none should be implied because employers had no notice of that interpretation. MPC contends employers had no duty to accommodate handicapped persons prior to 1991 in any fashion.

Martinell counters that the duty of reasonable accommodation was required long before the 1991 addition to § 49-2-101(15), MCA, and that § 49-2-303(1)(a), MCA, always required reasonable accommodation. Section 49-2-303(1)(a), MCA, has remained essentially the same since 1983 except to change the text to gender neutral language and to replace the term "handicap" with "disability."

Martinell further contends that because it was proper to look

18

to case law from federal and other state courts for resolution of cases under the Montana Human Rights Act prior to the 1991 legislative changes, the Montana Human Rights Act, as it existed prior to these changes, imposed an implied duty upon employers to make reasonable accommodation for their handicapped employees. She emphasizes the several administrative rules which provide that the Commission's rules are to be liberally interpreted to achieve remedial goals and assure enforcement and protection of the rights secured by them. See 24.9.201, -.301, and -.402, ARM. She further stresses the strict construction and narrow interpretation to be given to those reasonable demands of employment which are allowed as "bona fide occupational qualifications." 24.9.402(2), and -.1404, ARM. Although we are not concerned with bona fide occupational qualifications here, exemptions may exist for them where the physical requirements of a physically handicapped person would force an extraordinary financial hardship upon an employer. 24.9.1404, ARM.

The District Court's first conclusion in this case was that the former law, in effect until October 1, 1991, required nothing more than treating all employees in the same manner. However, the court reversed itself after considering Martinell's motion and ruled that a duty of reasonable accommodation was implied by former law and had not been newly imposed by the legislature.

The 1991 amendment changed the definition of physical and mental handicap in § 49-2-101(16), MCA, renumbering it as § 49-2-101(15), MCA, and changed the substance to read as follows:

19

(a)  "Physical or mental handicap" means:

(i)  a physical or mental impairment that substantially limits one or more of a person's major life activities;

(ii) a record of such an impairment; or

(iii) a condition regarded as such an impairment.

(b)  Discrimination based on, because of, on the basis of, or on the grounds of physical or mental handicap includes the <u>failure to make reasonable accommodations that are required by an otherwise qualified person who has a physical or mental handicap</u>. Any accommodation that would require an undue hardship or that would endanger the health or safety of any person is not a reasonable accommodation.  (Emphasis supplied.)

The 1993 Montana Legislature subsequently replaced the word "handicap" with "disability."

Under § 49-2-101(15)(b), MCA (1991), reasonable accommodation on the part of the employer is required where the employee is "an otherwise qualified person."  There is no question here that Martinell was otherwise qualified to perform her job requirements. At all times relevant to this case, she performed her job duties in a manner which met or exceeded MPC's requirements of a Chemical Lab Technician.  In addition, her doctor testified that she was capable of performing the technical aspects of her job.

Under MPC's interpretation of the pre-1991 provisions of the Montana Human Rights Act, the Act protected only those handicapped persons whose handicap had no effect on their employment.  Under that interpretation, a person capable of performing a particular job but who is forced to use a wheelchair would be protected if the job did not present access limitations for the person confined to the wheelchair.  However, if the employment location did not

20

provide access for persons with wheelchairs, the employer would not be required to provide any sort of accommodation, however minimal, even though the person otherwise had the mental acuity and physical ability to perform all aspects of the job. We conclude that the Montana Human Rights Act was intended to encourage full employment of handicapped persons, including handicapped persons whose handicap has some effect on employment. Clearly, that is consistent with the purpose of anti-discrimination legislation, which is remedial in nature and intended to assure enforcement and protection of the rights secured by the Montana Human Rights Act. In order to give effect to this goal, the Montana Human Rights Commission gives broad coverage and inclusive interpretation to the human rights statutes and rules. See 24.9.402, ARM. Notwithstanding the changes made by the 1991 Montana Legislature, we conclude it was appropriate to require a reasonable accommodation by employers under pre-1991 law where federal anti-discrimination laws provided protection to the employee.

Martinell notes that federal courts interpreting Title VII and administrative regulations have identified four types of discrimination that a handicapped person may face in employment: (1) intentional discrimination based on social bias; (2) neutral standards with a disparate impact; (3) surmountable impairment barriers; and (4) insurmountable impairment barriers. See, e.g., Prewitt v. United States Postal Serv. (5th Cir. 1981), 662 F.2d 292, 305. She claims that she faced obstacles during her employment with MPC which demonstrate discrimination based on

21

surmountable impairment barriers. Therefore, our discussion focuses on surmountable barriers required to reasonably accommodate a handicapped person.

MPC denied Martinell's request for a shift change and regular hours and continued to treat all employees alike. Martinell contends that her request for a change in shift scheduling was a surmountable barrier to her continued employment which could have been reasonably accommodated by MPC. She further contends that the requirement for a reasonable accommodation is inherent in legislation prohibiting physical handicap discrimination, whether or not the legislation expressly requires such accommodation, citing Holland v. Boeing Co. (Wash. 1978), 583 P.2d 621, 623. The District Court here adopted the following rationale from Holland:

> In 1973, the legislature amended the law against discrimination . . . to include a prohibition against discrimination in employment because of physical, mental or sensory handicaps. It recognized that the disabled, like many minority groups, face serious problems in seeking employment. . . . Legislation dealing with equality of sex or race was premised on the belief that there were no inherent differences between the general public and those persons in the suspect class. The guarantee of equal employment opportunities for the physically handicapped is far more complex.

> The physically disabled employee is clearly different from the nonhandicapped employee by virtue of the disability. But the difference is a disadvantage only when the work environment fails to take into account the unique characteristics of the handicapped person. . . . Identical treatment may be a source of discrimination in the case of the handicapped, whereas different treatment may eliminate discrimination against the handicapped and open the door to employment opportunities.

> . . . When, in 1973, the legislature chose to make this policy applicable to discrimination against the handicapped, we believe it is clear it mandated positive

22

steps be taken. An interpretation to the contrary would not work to eliminate discrimination. It would instead maintain the status quo wherein work environments and job functions are constructed in such a way that handicaps are often intensified because some employees are not physically identical to the "ideal employee." (Emphasis is original.)

Other state courts have implied a reasonable accommodation requirement as well. For example, the Iowa Supreme Court implied a duty to reasonably accommodate, stating that,

> Discrimination against the disabled differs from other types of discrimination in that other types, such as racial, religious, or sex discrimination, usually bear no relationship to the individual's ability to perform a job. Consequently, it is necessary to provide a requirement of reasonable accommodation in order to eliminate discrimination against the disabled.

Cerro Gordo County Care Facility v. Iowa Civil Rights Commission (Iowa 1987), 401 N.W.2d 192, 196-97, citing Holland v. Boeing Co., (Wash. 1978), 583 P.2d 621, 625.

The majority of jurisdictions addressing this issue are in accord with Cerro Gordo and Holland. See, e.g., Jenks v. AVCO Corp. (Pa. Super. 1985), 490 A.2d 912; Brand v. Florida Power Corp. (Fla.App. 1994), 633 So.2d 504; Carr v. General Motors Corp. (Mich. 1986), 389 N.W.2d 686; Coffman v. West Virginia Bd. of Regents (W. Va. 1988), 386 S.E.2d 1; and Montgomery Ward & Co. v. Bureau of Labor (Or. 1977), 570 P.2d 76.

As amicus curiae, the Montana Human Rights Commission filed a brief in this appeal generally supporting the arguments made by Martinell for this issue. The Commission specifically contends that MPC's argument is inconsistent with the purpose of the Montana Human Rights Act, the Commission's longstanding interpretation of

23

the law as it existed before the 1991 amendment, and the interpretations of similar laws by other state and federal courts. It further contends that the concept of reasonably accommodating handicapped persons is necessary to give meaning to § 49-2-303(1)(a), MCA (1983).

The Montana Human Rights Commission states that the Act was amended in 1991 to incorporate the definition of handicap used in the Rehabilitation Act of 1973, 29 U.S.C.A. §§ 706(8)(B) (1993); and 41 C.F.R. § 60-741.2 (1993). Both Martinell and the Commission also contend that the legislative history of the 1991 amendments indicates that they were intended to be remedial. Although we do not include a discussion on the legislative history of the 1991 amendments, we note that our conclusion in this case is further supported by that legislative history, which identifies the legislation as clarifying in nature in order to conform to federal law and prior decisions of the Montana Human Rights Commission.

The Montana Human Rights Commission provided the Court with opinions which it has issued, one in which counsel for MPC appeared before the Commission on behalf of Western Energy Company, MPC's wholly-owned subsidiary (Edwards v. Western Energy Company (1990), Case No. AHpE86-2865). The Commission asserts that these cases are indicative of the manner in which it has applied the reasonable accommodation requirement consistently to contested cases involving allegations of handicap discrimination, and further indicating that the concept of accommodation was fully developed well before Martinell sought an accommodation from MPC for her handicap. These

24

cases include a railway company required to make reasonable accommodation for a male clerk who could not perform heavy lifting, a deaf painter who was otherwise qualified to perform his job because he was able to overcome communication difficulties required for the job, a person of short stature who was not entitled to accommodation in the particular situation because of federal safety regulations, and a mill sweeper who suffered acrophobia and thus could not perform all functions of the job who was offered a reasonable accommodation of unpaid time off from the job during such times.

The Commission further states that a uniform body of case law has developed nationwide, leading to consistent opportunities for handicapped employees across the country, and that it has adopted the approach demonstrated in these cases in its quasi-judicial adjudications. It further notes that this Court has taken a similar approach in interpreting other clauses of the Montana Human Rights Act. See, e.g., Johnson v. Bozeman School Dist. No. 7 (1987), 226 Mont. 134, 734 P.2d 209 (McDonnell Douglas test used in case alleging employment discrimination based on marital status pursuant to school district's anti-nepotism policy); and Snell, 643 P.2d 841 (allegations of racial harassment addressed with federal case law arising under Title VII).

In addition, the Commission has informed the Court that it has determined that certain practices were discriminatory based on the employer's failure to make an individual assessment of a person's ability to perform the duties of a specific position, including an

25

accommodation assessment. Moreover, the cases provided by the Commission demonstrate its consistent application of the accommodation requirement for more than ten years prior to the 1991 amendments in cases involving handicapped workers.

MPC's argument that it had no notice under pre-1991 statutes that it was required to make reasonable accommodation for handicapped persons is specious in light of the fact that MPC addressed this topic in its Affirmative Action Program stating,

> It is the policy of The Montana Power Company to provide equal opportunity to all qualified handicapped individuals who are employees or applicants for employment. Positive action shall be taken to ensure the fulfillment of this Policy in areas such as:
>
> .   .   .   .
>
> C.    Treatment during employment . . .
>
> This Policy is consistent with the requirements and objectives set forth by the Vocational Rehabilitation Act of 1973 and applicable state laws.

MPC's Affirmative Action Program also includes the following definitions:

> "Handicapped individual" means any person who (1) has a physical or mental impairment which substantially limits one or more of such person's major life activities; (2) has a record of such impairment; or (3) is regarded as having such an impairment. For purposes of this Part, a handicapped individual is "substantially limited" if he or she is likely to experience difficulty in securing, retaining, or advancing in employment because of a handicap.
>
> "Qualified handicapped individual" means a handicapped individual who is capable of performing a particular job, with reasonable accommodation to his or her handicap. (Emphasis supplied.)

MPC's Chief Executive signed the Affirmative Action Program containing the above statements on August 30, 1982.

26

We conclude that the changes made by the 1991 Montana Legislature were not intended to and did not make any substantive changes in the law relating to discrimination on the basis of handicap. The 1991 amendments had the effect of clarifying the Montana Human Rights Act to more closely conform with comparable federal laws and with the consistent application of such laws by the Montana Human Rights Commission.

We hold the District Court correctly held that the pre-1991 version of § 49-2-303(1)(a), MCA, imposed a duty of reasonable accommodation on Montana Power Company.

## ISSUE III

Did the District Court err in concluding that Bonnie Martinell had been constructively discharged by Montana Power Company?

In analyzing constructive discharge in this case, we must view MPC's actions in light of its duty to make a reasonable accommodation for Martinell's handicap. Thus, the questions become whether MPC's conduct was defensible in terms of its duty to reasonably accommodate Martinell's handicap or whether the requested accommodation would have imposed an undue hardship on MPC. Our analysis here involves both conclusions of law and findings of fact. Legal conclusions are reviewed as stated previously to determine whether they are correct. This Court will affirm a district court's factual findings unless they are clearly erroneous. Interstate Prod. Credit Ass'n v. DeSaye (1991), 250 Mont. 320, 322, 820 P.2d 1285, 1287.

In DeSaye, we adopted the following three-part test to determine if findings are clearly erroneous: (1) first, the Court

27

will review the record to see if the findings are supported by substantial evidence; (2) if the findings are supported by substantial evidence, we will determine if the trial court has misapprehended the effect of the evidence; and (3) if both substantial evidence exists and the effect of the evidence has not been misapprehended, whether a review of the record leaves the Court with the definite and firm conviction that a mistake has been committed. DeSaye, 820 P.2d at 1287.

We previously referred to 24.9.1404, ARM, and § 49-2-101(15)(b), MCA (1991), as authority for certain exemptions to the employer's duty of accommodation and the strict construction to be allowed a claim of bona fide occupational qualification. The present law allows exceptions from the reasonable accommodation requirement in two distinct situations. Accommodations which would result in extraordinary financial hardship upon an employer, according to 24.9.1404, ARM, are appropriate in cases where certain classes of employees are foreclosed from certain employment opportunities. According to § 49-2-101(15)(b), MCA, accommodations which would require an undue hardship or that would endanger the health or safety of any person are exempted. This is consistent with the federal courts' application of the Rehabilitation Act of 1973, 29 U.S.C.A. §§ 701, *et seq.*, which allows an exception from the accommodation requirement where it would result in undue hardship.

The United States Supreme Court has held that the refusal to make accommodation for a handicapped person may be actual

28

discrimination because of the handicap. Southeastern Community College v. Davis (1979), 442 U.S. 397, 412-13, 99 S.Ct. 2361, 2370, 60 L.Ed.2d 980, 992. In the employment setting, other courts have held that the doctrine of constructive discharge may support a discrimination action if the employee quits to avoid a health-threatening environment. See, e.g., Miller v. AT&T Network Systems (D. Or. 1989), 722 F. Supp. 633, 639.

MPC relies on this Court's opinion in Snell, 643 P.2d at 846, for its assertion that discrimination by itself is not constructive discharge; rather, the court must first look to the totality of the circumstances in a discrimination case before finding constructive discharge. In Snell, 643 P.2d at 846, we cited Nolan v. Cleland (N.D. Cal. 1979), 482 F. Supp. 668, 672, which stated as follows:

> A determination of constructive discharge depends on the totality of circumstances, and must be supported by more than an employee's subjective judgment that working conditions are intolerable. (Emphasis supplied.)

We also noted that a finding of racial harassment would not automatically mandate a finding of constructive discharge and that Nolan had found that there was no clear standard for constructive discharge in a Title VII case. Snell, 643 P.2d at 846.

Snell, a Title VII racial discrimination case, does in fact support the use of a "totality of the circumstances" analysis. However, MPC further cites Finstad v. Montana Power Co. (1990), 241 Mont. 10, 785 P.2d 1372; and Frigon v. Morrison-Maierle, Inc. (1988), 233 Mont. 113, 760 P.2d 57, for this argument. Neither case used the totality of the circumstances test. Both Frigon and Finstad addressed issues of constructive discharge in the context

29

of the covenant of good faith and fair dealing with the question phrased as whether the employer had rendered the working conditions so oppressive that resignation was the employee's only reasonable alternative. Finstad, 785 P.2d at 1382. Frigon, 760 P.2d at 61, specifically stated that the application of a test using a totality of the circumstances in wrongful discharge cases had not been recognized beyond Title VII discrimination cases such as Snell. Frigon and Finstad are not discrimination cases and, therefore, the standard applied is not to be confused with the standard used in discrimination cases under the Montana Human Rights Act. We conclude that the totality of the circumstances test is to be used for determining constructive discharge in handicap discrimination cases.

Although the District Court here concluded that a constructive discharge had occurred based solely on MPC's refusal to consider Martinell's request for accommodation, we emphasize that every case of failure to consider a request for an accommodation may not constitute discrimination as a matter of law. Nonetheless, in this case the record overwhelmingly supports the District Court's findings and conclusions and the ultimate conclusion that a constructive discharge occurred based on a totality of the circumstances, including the failure to consider an accommodation. As discussed below, we conclude that the totality of the circumstances leading up to Martinell's resignation supports the conclusion that she was constructively discharged.

MPC contends that Martinell had many reasonable alternatives

available to her other than resignation. These alternatives included the following: (1) paid sick leave and personal leave for illness-related absences, (2) an extended leave of absence, (3) transfer to another job within MPC or elsewhere, (4) pregnancy, and (5) hysterectomy. These were the same arguments made to the District Court which the court characterized as unreasonable. MPC further contends that there was no action on its part, other than the refusal to grant Martinell's request for a shift change, to support the District Court's conclusion of constructive discharge. We have stated that such action can in some cases constitute a constructive discharge, but the analysis must be made by considering the unique facts of each case.

The District Court addressed each of MPC's posited alternatives and concluded all were unreasonable under the circumstances present in this case. Martinell had missed numerous days of work due to her endometriosis and medication induced depression, despite the fact that her endometriosis pain was partially controlled by taking Danocrine or Provera. Dr. Rauh and Dr. Peterson had opined that she would benefit from normal sleep patterns and regular hours which would have been possible if MPC had granted her scheduling request. Dr. Rauh's testimony indicates that Martinell could have decreased her absenteeism with a likely result of lessening her symptoms from the endometriosis. This could have been accomplished with little or no additional cost to MPC.

The record contains evidence of several instances where MPC

31

accommodated employee problems by allowing employee's to work regular day shifts, including one employee's marital problems, health problems and Martinell's own first pregnancy. Moreover, Martinell's physician advised MPC that her health could have been positively affected by regular hours and the progression of her endometriosis could have been slowed, or, at the least, could have presented less severe symptoms.

However, Martinell's personnel file disclosed a letter indicating MPC was on the verge of terminating her due to excessive absenteeism. Martinell further testified that a prior request for a leave of absence had been thrown in the trash by her supervisor. She was told that she could not take further time off without an excuse from her doctor. Her doctor had already notified MPC that she had endometriosis which was negatively affected by her work schedule and her supervisor was familiar with her past history of absence caused by her illness. Clearly, there was pressure not to be absent again by the treatment accorded previous absences. When Martinell told Walker, her supervisor, that her doctor was gone until the end of August on the occasion of her last absence in mid-August of 1984, he refused to allow her to return to work without an excuse even when she told him she could not get one for approximately two weeks. When she went over his head to the highest-ranking official of MPC in Colstrip and received permission to return to work without an excuse, Walker refused to speak to her on her return to work. Obviously, the fact that she had been paid for sick and personal leave in the past did not guarantee that she

32

could continue to use these alternatives. The evidence indicates the opposite.

A transfer to another job also was not feasible here. Martinell had applied for numerous positions within MPC and Western Energy Company without success. Despite the fact that she had the most seniority in the Chemical Lab and had trained other employees on the job, she was not offered the job of Chemical Lab Supervisor. The record indicates that she was qualified for this position. This position also would have allowed her to work regular day shifts. Thus, it does not appear that another job within MPC was a reasonable alternative to terminating employment.

As specifically pointed out by the District Court, pregnancy and hysterectomy were also unreasonable alternatives for Martinell. This argument does not merit further analysis.

MPC's argument that there were reasonable alternatives is contradicted by the overwhelming evidence that there was no such alternative. We conclude the District Court's determination that there was no reasonable alternative is supported by substantial evidence in the record.

We further conclude that the District Court correctly determined that MPC could have accommodated Martinell's request without undue hardship. Under current Montana law, handicap discrimination cases are further analyzed according to the statutory standard set forth in § 49-2-101(15)(b), MCA; that is, the analysis to be used is based on whether the requested accommodation would cause undue hardship to the employer or

33

endanger the health or safety of any person. The District Court's analysis of constructive discharge under pre-1991 law appropriately included a determination of undue hardship. MPC does not argue that accommodating Martinell's request would have created any undue hardship. Instead, it contends that accommodation would have been unfair to other employees and would have disrupted the operations of the Colstrip plant. MPC did not introduce factual evidence during the trial to support these statements or to show they supported a finding of undue hardship.

In its initial decision which held MPC had no duty to accommodate Martinell's handicap, the District Court noted that this Court had not addressed the issue of reasonable accommodation under pre-1991 law, and made findings in the event that its interpretation was incorrect. The court stated:

> 26. Not seeing the need to reasonably accommodate, MPC failed to reasonably accommodate Bonnie Martinell's handicap. The Court specifically finds that MPC could have placed Bonnie Martinell on straight day shifts without undue hardship. Only a short time before, the laboratory had been run on straight days, with overtime as needed. It wasn't until the lab personnel themselves requested a shift work that MPC implemented a shift policy. At the very least, MPC could have inquired whether the other workers objected and allowed Bonnie Martinell to work the day shifts of workers such as Becky Dodd who offered to give her day shift to Bonnie Martinell. MPC did not do what it could to reasonably accommodate Bonnie Martinell's handicapped condition. . . .

> 27. If MPC had a duty of reasonable accommodation, the Court would have conclude[d] that the resulting discrimination placed Bonnie Martinell in an untenable situation, and, although there were other possible alternatives available to Bonnie Martinell, none of these alternatives would be considered reasonable by the Court. If MPC had a duty of reasonable accommodation, the Court would have found that she was constructively discharged

34

by reason of the discrimination and that she had no reasonable alternative other than terminating her employment. . . .

The duty to accommodate may include restructuring the job in terms of work scheduling.  29 C.F.R. § 1613.704(b) (1993); 34 C.F.R. § 104.12(b)(2) (1993); and Illinois Bell, 547 N.E.2d at 509. Martinell knew her employment was in jeopardy because of her absences.  She periodically missed work because stress caused by working long, irregular hours caused back pain.  Evidence was presented that this situation could have been improved if MPC had granted the accommodation she had requested.

Evidence was also presented that Becky Dodd, a co-worker in the lab, had offered to change shifts with Martinell and that MPC declined to consider this offer.  No evidence was presented to indicate the two other employees in the lab were ever consulted about shift changes and no evidence was submitted to establish their preference for shifts.  However, prior to 1983 when rotating shifts began, all lab employees worked day shifts, with the result that they all worked a lot of overtime.  In an effort to cut down on overtime, the employees requested a rotational scheduling plan so that they would not be required to work so much overtime between the hours of 4:30 p.m. and 8:00 a.m.  MPC granted this request in 1983, but did not implement any of the shift schedules proposed by the employees.

Clearly, there is substantial evidence in the record to support the District Court's findings and conclusions in this case. Substantial evidence is evidence that a reasonable mind might

35

accept as adequate to support a conclusion; it consists of more than a scintilla of evidence and it may be somewhat less than a preponderance of the evidence. Barrett v. ASARCO, Inc. (1990), 245 Mont. 196, 200, 799 P.2d 1078, 1080. We conclude, according to the DeSaye test, substantial evidence supports the District Court's findings and the effect of the evidence has not been misapprehended. Moreover, after our review of the evidence, the Court is not left with the definite and firm conviction that a mistake has been made. We conclude these and other findings of the District Court, as included in the record and partially set forth above, support the conclusion that Martinell was constructively discharged because of her handicap based on a totality of the circumstances in this case. We further conclude the District Court's finding that MPC could have accommodated Martinell's handicap without undue hardship is supported by substantial evidence as well.

We hold the District Court did not err in concluding that MPC had constructively discharged Martinell by failing to accommodate her handicap in this case.

### ISSUE IV

Did the District Court err by awarding $467,364 in damages to Bonnie Martinell?

MPC contends that the District Court erred, as a matter of law, in awarding Martinell the sum of $467,364 for three reasons: (1) Martinell did not diligently pursue other employment after she resigned from MPC; (2) the damages awarded, particularly the front pay damages, were entirely speculative; and (3) Martinell did not

36

demonstrate that reinstatement was an inappropriate remedy. The amount awarded represents $191,481 in past loss of income and $275,883 for future loss of income directly caused by her termination from employment because of her illness. We address each of these assertions separately. The standard of review used by this Court when reviewing an award of damages is whether the court abused its discretion. Edington v. Creek Oil Co. (1984), 213 Mont. 112, 127, 690 P.2d 970, 978. Further, we have said that a defendant should not escape liability because the amount of damage cannot be proved with precision. Edington, 690 P.2d at 978. The court's findings are reviewed under the DeSaye test previously set forth in this opinion.

## A. Mitigation of Damages

MPC's first argument focuses on Martinell's efforts to obtain employment following her resignation on September 6, 1984. The District Court made the following finding of fact:

> 17. Bonnie Martinell made reasonable efforts to mitigate her damages and was not required to reapply for employment to MPC or its subsidiaries given the circumstances of her termination.

MPC contends that the trial record does not support this finding because the only gainful employment on Martinell's part from the date of her resignation--September 6, 1984, until the date of trial, November 9, 1990--was a temporary position with the Bitterroot National Forest in the summer of 1989. Martinell earned $3,602 working in this position.

MPC further contends that Martinell's efforts in obtaining employment do not establish diligence on her part, particularly

37

where she freely admitted to not searching for employment for extended periods of time. It relies on Dawson v. Billings Gazette (1986), 223 Mont. 415, 726 P.2d 826, as authority for an award of zero damages to Martinell because, according to MPC, there is clearly no evidence in the record to show that Martinell made reasonable efforts to mitigate her damages.

Under Montana law, a terminated employee has a duty to exercise ordinary diligence to procure other employment. Ordinary diligence does not require a terminated employee to search for employment in another line of work or to move to a different locality. Dawson, 726 P.2d at 828. MPC contends that the facts in Dawson are exactly the same as here because Martinell applied for only four jobs during the period of July 1988 through August 1989. In Dawson, the Court upheld a jury's award of zero damages to an employee who had only applied to four potential employers and who had restricted the scope of his job search. MPC claims the circumstances are similar here as Martinell had other periods of time when she did not search enthusiastically for jobs. These times include the times when she was pregnant and recuperating from surgery.

Dawson is an inapposite analogy in this case. There, the evidence presented showed that the plaintiff had limited his job search unreasonably and that it was "very likely" that he could have obtained employment if he had vigorously searched for it. In Dawson, there was conflicting evidence concerning damages and the record indicated that the jury could have found that Dawson

38

suffered no damages. Dawson, 726 P.2d at 828. That is not the case here.

MPC's contention that Martinell could have applied for any of the 643 position openings with MPC and its subsidiaries during the time prior to trial is unconvincing. MPC provided testimony that 643 openings were available before the time of trial and argues that "several hundred openings were available to Mrs. Martinell if she had only applied for employment with Western Energy or MPC" and that her failure to apply for any of these openings establishes that she did not exercise ordinary diligence in attempting to procure employment. Clearly, the evidence as reviewed in Issue III above demonstrates the opposite--that the working climate leading up to her resignation was not encouraging for future employment opportunities with MPC, particularly with a letter in her file in which Don Berube wrote that she was not recommended for rehire.

Martinell has a Bachelor of Science degree from Montana State University in Agricultural and Animal Science. After obtaining this degree, she worked for MHD Research Center in Butte as an Environmental Coordinator. Her job duties included working as a consultant to MPC on its environmental impact for Colstrip. Her husband transferred to Colstrip and Martinell obtained employment with Western Energy Company at its Rosebud Mine near Colstrip as an Environment and Range Technician. In that position, she did air quality data collection and analysis, range data collection and analysis, range seed collection and transplanting for reclamation. Following this position, Martinell transferred to MPC's Chemical

39

Lab in April of 1981. Clearly, Martinell's specialized training and experience in the scientific field are not the sort of general qualifications likely to qualify her for the "hundreds of openings" available, as argued by MPC.

Nonetheless, Martinell provided testimony that she had applied for and been rejected by MPC and Western Energy for numerous jobs in her field prior to her termination. She provided testimony that she applied for many jobs in the Colstrip area, both within and outside of her field following her 1984 resignation. She testified that she applied for a great many positions and sent out resumes to numerous employers both in and out of Montana, including several power plants out of state, in an unsuccessful attempt to obtain employment in her field as a lab technician. Her only employment was with MPC and its subsidiaries and her personnel record there included the letter recommending she not be rehired. Upon her return to Colstrip in October of 1990 when her husband was rehired by MPC, she applied for positions in other labs in the area surrounding Colstrip, including Miles City and Forsyth. She also applied for some positions not in her field, such as a position in a flower shop.

Although her job search had proved unsuccessful up to the time of trial, there is substantial evidence as set forth above to indicate that Martinell exercised at least ordinary diligence in searching for employment after September 6, 1984, the date of her termination of employment with MPC.

According to E.C.A. Envtl. Mgmt. Services, Inc. v. Toenyes

40

(1984), 208 Mont. 336, 350, 679 P.2d 213, 220, and numerous federal decisions interpreting Title VII, MPC has the burden of proving Martinell's failure to mitigate as an affirmative defense. Title VII cases establish that the general rule is that the employer charged with discrimination under Title VII can toll the continuing accrual of damages by offering the claimant a job without conditions attached. If the claimant then rejects the offer of employment, damages cease to accrue. Ford Motor Co. v. E.E.O.C. (1982), 458 U.S. 219, 241, 102 S.Ct. 3057, 3070, 73 L.Ed.2d 721, 739. The Ford Motor Co. decision has been widely adopted in discrimination and wrongful termination cases because it is consistent with policies of encouraging defendants to make curative, unconditional offers of employment, thereby voluntarily complying with applicable law in order to end discrimination and more quickly close litigation. Boehm v. American Broadcasting Co. (9th Cir. 1991), 929 F.2d 482, 485; and Holmes v. Marriott Corp. (S.D. Iowa 1993), 831 F. Supp. 691, 709. MPC could have unconditionally offered employment to Martinell at any time during these proceedings to toll her damages. It chose not to do so.

Further, Martinell provided expert testimony by a qualified economist to support the award of back pay. We conclude that MPC did not meet its burden in this case. We further conclude that Martinell provided substantial evidence to support the court's finding that she made reasonable efforts to obtain employment and that back pay in the amount of $191,481 was appropriate.

## B. Front Pay Damages

41

MPC's second argument concerning damages is that Martinell did not establish that future damages were reasonably certain to occur and the award of $275,883 in front pay is speculative. MPC further contends that the record does not contain credible evidence that Martinell would incur future loss of income in that amount. This amount, as testified to by Martinell's expert, did not include punitive damages or damages for emotional distress.

The record does establish that future employment with MPC was highly unlikely for Martinell, particularly as MPC had not offered employment to toll Martinell's damages. Martinell also presented evidence that she would likely remain in the Colstrip area because her husband works for MPC and he will likely continue that employment. She established by unrebutted expert testimony--from an economist experienced in the field of forecasting future income--that the rate of pay she likely would have earned at MPC, had she continued working there for the remainder of her working life, was substantially higher than that of other lab technicians with similar qualifications in Montana. The amount of front pay, $275,883, was the estimate provided by Martinell's expert to equal the difference between the average future earnings of lab technicians in Montana working for other employers and future earnings of MPC's lab technicians, reduced to present value. In determining this amount, Martinell's expert relied on statistics provided through the Montana Department of Labor and Industry.

Section 27-1-203, MCA, allows a trier of fact to award damages that are certain to result in the future. We have held that future

42

damages need only be reasonably certain and not absolutely certain, and of necessity are the subject of some degree of conjecture and speculation. Kerr v. Gibson Products Co. of Bozeman, Inc. (1989), 226 Mont. 69, 74, 733 P.2d 1292, 1295. The district courts have discretion whether to award any future damages and also have discretion in the amount of such damages. Swanson v. St. John's Lutheran Hosp. (1980), 189 Mont. 259, 265, 615 P.2d 883, 886. We conclude the District Court did not abuse its discretion in awarding future damages and the amount of damages is supported by substantial credible evidence in the record.

## C. Reinstatement

MPC contends that the evidence is sufficient to establish that reinstatement was a viable option in lieu of front pay. Both parties cite Hearing Aid Inst. v. Rasmussen (1993), 258 Mont. 367, 377-78, 852 P.2d 628, 635, as authority for the principle that front pay may be awarded in lieu of reinstatement when the district court has determined that antagonism exists between the parties. MPC argues that the District Court failed to make specific findings of fact regarding hostility or antagonism between Martinell and MPC. Martinell contends that the antagonism between the parties is evident from the record and the damage award will be upheld if the Court concludes that the trial judge's findings and conclusions are clear to this Court. Further, she contends that a failure to state them in certain format is not substantial error.

We conclude that the evidence submitted to the court during the trial supports a finding that there was indeed antagonism

43

between the parties. Nonetheless, the District Court entered the following findings and conclusions:

> 14. A high degree of tension existed between Bonnie Martinell and her immediate supervisor relating to Bonnie Martinell's medical condition, her sick leave and her requests for accommodation.
>
> . . . .
>
> 17. Bonnie Martinell . . . was not required to reapply for employment to MPC or its subsidiaries given the circumstances of her termination.
>
> . . . .
>
> 27. . . . The Court also finds that the work climate and the continued tension between Bonnie Martinell and her immediate supervisors was such, that when combined with the chronic pain and the "final" decision of MPC regarding the shift change made anything short of termination unreasonable. MPC also suggests that there was a standing offer for a leave of absence, yet [their] own internal memoranda confirms Bonnie Martinell's assessment that if she missed any more work, she would be fired. . . .

Not only does the record support these findings, but it further supports the same with regard to other MPC officials in addition to her immediate supervisors. Moreover, she was not recommended for rehire partly due to the medical condition, and even when it was resolved--as early as 1986 and four years prior to trial--MPC did not unconditionally offer employment to Martinell despite the fact that it maintains in its arguments before this Court that there were hundreds of jobs she would have been qualified for at MPC or Western Energy Company.

Nothing in the record nor in the arguments of MPC before this Court supports in any way a conclusion that anything would have been different if Martinell had reapplied for employment with MPC.

44

Martinell's own testimony was that she did not think it would do any good to reapply with MPC considering the treatment she received during her employment there.

We conclude that the District Court's findings and conclusions reveal that the court carefully considered this issue and determined that antagonism existed between Martinell and MPC and, therefore, properly awarded front pay in this case.

We hold the District Court did not err in awarding $467,364 in damages to Martinell.

Affirmed.

_____
Justice

We Concur:

_____
_____
_____
_____
Justices

45