No. 03-757

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 123

NINA BENJAMIN,

        Petitioner, Respondent, and Cross-Appellant,

   v.

JERRY ANDERSON and DARINDA WILLIAMS,
d/b/a JOKER'S WILD BAR AND RESTAURANT,

        Respondents, Appellants, and Cross-Respondents,

   and

RICHARD WILLIAMS,

        Cross-Respondent.


APPEAL FROM:    District Court of the Fourth Judicial District,
                   In and for the County of Missoula, Cause Nos. DV 02-427 and DV 02-419
                   The Honorable Ed McLean, Judge presiding.

COUNSEL OF RECORD:

        For Appellants:

            Richard R. Buley, Tipp & Buley, Missoula, Montana

        For Respondent:

            Lucy T. France, Garlington Lohn & Robinson, Missoula, Montana; Timothy
            C. Kelly, Attorney at Law, Emigrant, Montana


                       Submitted on Briefs:  May 4, 2004

                                 Decided:  May 17, 2005

Filed:

_____
                             Clerk
Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 Jerry Anderson ("Anderson") and Darinda Williams ("Darinda"), the former manager and former owner of Joker's Wild Bar and Restaurant, respectively, appeal from the Opinion and Order of the Montana Fourth Judicial District Court, in which the court determined that they were liable for sexual discrimination by sexual harassment against Nina Benjamin ("Benjamin"). Benjamin cross-appeals that portion of the District Court's Order which dismissed Richard Williams ("Dick") as a party to that lawsuit. We affirm the District Court on both the appeal and cross-appeal.

## ISSUES

¶2 Anderson and Darinda present five issues on appeal, which we restate as follows:

¶3 1. Did the District Court err when it concluded that Benjamin's complaint was not barred by the statute of limitations?

¶4 2. Did the District Court err when it concluded that sexual harassment had occurred, without making an explicit finding that the alleged sexual harassment was sufficiently severe or pervasive as to alter Benjamin's conditions of employment and create an abusive work environment?

¶5 3. Did the District Court err when it upheld damages for lost wages?

¶6 4. Did the District Court err when it concluded that Benjamin's wage loss recovery should not be reduced for failure to mitigate?

¶7 5. Did the District Court err when it re-imposed the Hearing Examiner's award for emotional distress, and refused to strike the award of damages altogether?

¶8    Benjamin presents one issue on cross-appeal:

¶9    6.  Did the District Court err when it concluded that Dick was not the employer or an agent of the employer of Benjamin?

**FACTUAL AND PROCEDURAL BACKGROUND**

¶10    Benjamin filed a complaint of discrimination with the Montana Human Rights Bureau of the Department of Labor and Industry on September 17, 1999, alleging that Anderson, Darinda, and Darinda's husband Dick, committed sexual discrimination by sexual harassment.  A contested case hearing proceeded from January 23 through January 27, 2001. The Hearing Examiner entered the Final Agency Decision on January 2, 2002, concluding that Anderson and Darinda had committed sexual discrimination by sexual harassment against Benjamin, but further concluding that Dick was not liable to Benjamin, dismissing him from the case.  Anderson and Darinda appealed the Final Agency Decision to the Montana Human Rights Commission ("HRC").  The HRC issued its Order Affirming and Amending Final Agency Decision on April 23, 2002, in which it upheld the majority of the Final Agency Decision, but concluded that the Hearing Examiner's award of monetary relief for Benjamin's emotional distress was excessive and reduced it from $75,000 to $40,000. The HRC also determined that an error had been made in calculating Benjamin's health care expenses and added $10,552 to the medical award.

¶11    Anderson and Darinda appealed the HRC decision to the District Court.  Benjamin cross-appealed the issues of the dismissal of Dick and the HRC's reduction of the emotional distress award.  In its Opinion and Order filed September 12, 2003, the District Court upheld

3

the finding of Anderson's and Darinda's liability, reinstated the Final Agency Decision's emotional distress award of $75,000, and affirmed Dick's dismissal from the case. This appeal follows.

¶12    In determining whether or not substantial credible evidence supports the findings at the hearings level, we view the evidence in the light most favorable to the respondent. *See Hunter v. City of Bozeman* (1985), 216 Mont. 251, 255, 700 P.2d 184, 187 (citations omitted). Thus, where contradictory evidence exists, we recite the facts as found by the Hearing Examiner in the Final Agency Decision.

¶13    Benjamin (formerly Nina Lande), was an employee at Joker's Wild Bar and Restaurant in Missoula from September 17, 1998, through March 29, 1999. Benjamin worked primarily as a cocktail waitress. She was supervised by Anderson, Darinda, and Darinda's son Michael Williams ("Michael"). Her regular shift was the evening shift in the lounge, where she usually worked with bartender Nicole Crisafulli ("Crisafulli"). Benjamin occasionally worked banquets at Darinda's request in addition to her cocktail waitress shifts.

¶14    During the time Benjamin worked at Joker's Wild, Darinda owned the business and Anderson and Michael both worked as managers. Dick was an active adviser to the business, and held an ownership interest in the name "Joker's Wild." Further details about Dick's involvement with Joker's Wild will be provided in the discussion below.

¶15    In December 1998, Joker's Wild held an employee Christmas party at the restaurant and provided free liquor to attending employees and their guests. Benjamin and her then-husband, Tim Lande ("Lande"), attended. Darinda was the on-duty manager at the start of

4

the party. She distributed bonuses and gifts to employees, including a $100 bonus to Benjamin. She also announced that Anderson and Michael were purchasing Joker's Wild. Indeed Anderson and Michael did buy the business later in 1999--a fact which the Hearing Examiner found significant, given the manner in which the Joker's Wild management chose to deal with Benjamin's complaint about Anderson's behavior toward her.

¶16    Darinda left the premises during the party, leaving Anderson as the on-duty manager. Anderson did not drink any alcohol at the party, but did tend bar briefly so that the hired bartender could take breaks. Joker's Wild had a policy which required managers to ensure that intoxicated customers and employees would not drive themselves home. Anderson left the party at least once to drive an intoxicated guest home.

¶17    Lande left before the end of the party, but Benjamin remained. She had several mixed drinks and danced with Anderson and a member of the hired band. When she was ready to leave, it was apparent to other attendees that she was too intoxicated to drive. Anderson told Benjamin he would give her a ride home. Crisafulli also offered to give Benjamin a ride home, but Benjamin refused Crisafulli's offer, reasoning that Anderson lived near Benjamin while Crisafulli would have to drive out of her way to take Benjamin home.

¶18    Anderson left Joker's Wild with Benjamin as his passenger. He did not drive her directly home, but traveled on side streets and stopped his car three or four times to pursue sexual contact with Benjamin. Benjamin drifted in and out of consciousness, and awakened to discover that Anderson was attempting to remove her clothing. During one stop,

Benjamin told Anderson that she believed she was going to be ill. Anderson let her out of the car. Benjamin then returned to the car and Anderson drove her home.

¶19    The following day, Benjamin called in sick to work. She testified that she was both too ill and too ashamed of the incident with Anderson to face him at work. Benjamin returned to work three days after the Christmas party. At the beginning of her first shift, Anderson asked her to "have a bite to eat" with him. Benjamin refused. Anderson persisted, and Benjamin agreed to meet him at a table in the bar area of Joker's Wild. They discussed Anderson's actions after he left the Christmas party with Benjamin. Benjamin explained that she did not know how she had gotten so intoxicated at the party, and further told Anderson that she wanted to ensure that no further intimate contacts occurred between them. In response, Anderson hinted that the sexual contact between them was more intimate than Benjamin remembered, and further suggested that she had been a willing participant. He instructed Benjamin not to tell anyone else about what had occurred.

¶20    Soon afterward, Benjamin discussed the incident with Crisafulli and Janice Howard ("Howard")--a former co-worker at Joker's Wild and personal friend. Benjamin did not approach Darinda, Michael, or Dick to discuss the incident with Anderson. During Benjamin's employment at Joker's Wild, the business did not have a sexual harassment policy nor a written procedure for investigating complaints of sexual discrimination or sexual harassment. Darinda testified that if an employee had a problem, that employee would talk with Anderson, Michael, Dick, or Darinda. Employees were not told there was a procedure, but were expected to figure out what to do on their own. Eventually, rumors spread at

6

Joker's Wild that something had happened between Benjamin and Anderson on the night of the Christmas party.

¶21    While Benjamin was on vacation in late January and early February of 1999, Howard told Dick that a problem had occurred between Anderson and Benjamin after the Christmas party. Howard and Dick then informed Darinda. Darinda and Dick contacted Michael and told him there had been an "incident" between Benjamin and Anderson, and asked Michael to speak with Benjamin after she returned from vacation. Darinda and Dick took no further action to investigate the "incident."

¶22    When Benjamin returned from vacation, Michael contacted her and arranged a meeting. Benjamin told Michael that Anderson had not taken her directly home and that things had happened that she did not want to happen. Michael told her that he would "take care of it," and that Benjamin's job was not in jeopardy. Michael apologized to Benjamin, saying he was sorry that "this" had happened. Michael and Benjamin did not discuss what actions, if any, would be taken by Joker's Wild in response to this discussion.

¶23    Michael next talked to Anderson. He informed Anderson that he had already spoken with Benjamin and hinted that he knew what had happened. Anderson admitted that he had made sexual advances toward Benjamin, and that there had been sexual contact between them. He claimed that the sexual contact had been consensual. Knowing that Benjamin had been extremely intoxicated at the time, Michael told Anderson that Joker's Wild could not have repeat instances of such conduct and ordered Anderson to leave Benjamin alone.

Michael and Anderson did not again discuss the incident and no further action or investigation was undertaken by anyone at Joker's Wild.

¶24   Anderson avoided Benjamin for a while after her vacation, but then began to supervise her again. Benjamin testified that Anderson used his supervision of her as an excuse to brush up against her and touch her unnecessarily, and that Anderson put Benjamin in situations where she had to work in close physical proximity to him.

¶25   Through the middle of February 1999, Benjamin received favorable comments concerning her work at Joker's Wild. As late as February 15, 1999, Darinda acknowledged that customers liked Benjamin. Crisafulli and Michael also complimented Benjamin on her work. Soon after Darinda, Michael, and Dick learned of the "incident," co-workers told Benjamin that Darinda was accusing her of having a "flirtation problem." Benjamin testified that Darinda seemed to be avoiding her, and Michael and Dick were watching her while she worked.

¶26   Benjamin's job performance began to suffer. Management received complaints about her job performance from some of her co-workers.

¶27   As a general security practice, Joker's Wild utilized surveillance cameras. In March 1999, Darinda and Michael reviewed tapes of Benjamin at work. The surveillance tapes did not provide any evidence of poor work performance by Benjamin. Darinda and Michael did not review tapes of Anderson.

¶28   On March 20, 1999, Benjamin agreed to work a shift for another employee, believing that Anderson was not scheduled to supervise that shift. Anderson, however, was the

supervisor for that shift, during which he behaved inappropriately toward Benjamin in spite of Benjamin's attempts to avoid him. After Benjamin's shift, Anderson told Darinda that Benjamin had performed poorly. Later that week, Michael approached Benjamin to discuss her failure to provide service to a particular customer in Joker's Wild. When Benjamin attempted to explain to Michael that she was afraid of the customer, he interrupted her and yelled at her in front of others in the casino. Michael terminated Benjamin's employment at Joker's Wild on March 29, 1999.

¶29 In August 1999, Anderson gave another Joker's Wild employee a ride home after she became too intoxicated to drive. Anderson had sexual contact with the employee while she was in the car, and attempted to pursue further sexual contact with her a few days later while they were both at work. The employee complained to Michael about Anderson's conduct, and Michael's wife, who also worked at Joker's Wild at that time, obtained a written statement from the employee which stated that Anderson's advances were unwelcome. A few days after Michael received this statement, Anderson executed an agreement which terminated his interest in Joker's Wild and in the partnership.

**STANDARD OF REVIEW**

¶30 Actions brought before the HRC are subject to the requirements of the Montana Administrative Procedure Act ("MAPA"). *Moran v. Shotgun Willies, Inc.* (1995), 270 Mont. 47, 50, 889 P.2d 1185, 1186. The standard of review of an agency decision under MAPA, set forth at § 2-4-704(2), MCA, provides in pertinent part:

9

The court may not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because:

(a) the administrative findings, inferences, conclusions, or decisions are: . . . (v) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; [or] (vi) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. . . .

¶31 A three-part test is used to determine whether agency findings are clearly erroneous: (1) the record is reviewed to determine if the findings are supported by substantial evidence; (2) if the findings are supported by substantial evidence, it will be determined whether the agency misapprehended the effect of the evidence; and (3) if substantial evidence exists and the effect of the evidence has not been misapprehended, the reviewing court may still decide that a finding is clearly erroneous if a review of the record leaves the court with a definite and firm conviction that a mistake has been made. *Total Mechanical Heating v. UEF*, 2002 MT 55, ¶ 22, 309 Mont. 84, ¶ 22, 50 P.3d 108, ¶ 22.

¶32 We review conclusions of law to determine if they are correct. *Moran*, 270 Mont. at 51, 889 P.2d at 1187.

## DISCUSSION

### ISSUE ONE

¶33 Did the District Court err when it concluded that Benjamin's complaint was not barred by the statute of limitations?

¶34 Darinda and Anderson claim that, according to the Hearing Examiner, the sexual discrimination against Benjamin was the result of the sexual assault which occurred following the December 1998 Christmas party. They maintain that the Hearing Examiner specifically found that this single incident was severe enough to create a hostile work environment. Noting that pursuant to § 49-2-501(4), MCA, a claimant has 180 days in which to file a complaint with the Department of Labor and Industry, and that Benjamin did not file her Complaint until September 17, 1999--well beyond 180 days from the December 1998 Christmas party--they claim Benjamin's claim is time-barred.

¶35 Benjamin responds that the District Court correctly concluded that her complaint was timely. She argues that substantial credible evidence, as detailed in the Final Agency Decision, illustrates that she was subjected to company-wide discrimination. She points out that she filed her complaint within 180 days of her termination from Joker's Wild, and that her claim was not based solely upon the assault after the Christmas party, but encompassed all of the acts which occurred from December 1998 until her termination in late March 1999. She claims the many incidents documented in the Final Agency Decision were part of the hostile environment which existed at Joker's Wild, culminating in her termination.

¶36 Benjamin further argues that her termination was itself a discriminatory act and part of the hostile environment at Joker's Wild. She notes that the Hearing Examiner found that Anderson played a part in her termination, and asserts that other courts have found that such a termination action is tainted if a supervisor with a "discriminatory animus" is found to have played a role in the decision. *See Sink v. Knox County Hosp.* (S.D. Ind. 1995), 900 F. Supp.

11

1065, 1077. She further notes that the Final Agency Decision repeatedly characterizes the period of her hostile environment claim as continuing from the Christmas party *through* her termination.

¶37 Both parties press this Court to find their witnesses to be more credible than the opposing witnesses, and call our attention to a myriad of conflicting testimony, personal animosities, and ulterior motives which each side claims casts doubts upon the credibility of the opposing party's claims. However, under § 2-4-704(2), MCA, a court reviewing an agency decision may not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. As long as we determine that substantial credible evidence exists to support the findings of the trier of fact, we may not re-weigh the evidence, but must instead defer to the Hearing Examiner. "A hearing examiner, when one is used, is in the unique position of hearing and observing all testimony entered in the case. . . . The findings of the hearing examiner, especially as to witness credibility, are therefore entitled to great deference." *Moran*, 270 Mont. at 51, 889 P.2d at 1187 (citation omitted).

¶38 While Darinda and Anderson claim that the Hearing Examiner and the HRC found that a single incident--the assault--constituted the event behind Benjamin's claim, it is more accurate to state that the HRC found that one incident *would have been* sufficiently severe to constitute sexual discrimination *but even more followed*. As addressed above, the Final Agency Decision in fact delineates actions that occurred and recurred over a several-month time-span.

¶39 The Hearing Examiner concluded that Benjamin demonstrated that the discrimination against her at Joker's Wild consisted of "a series of related acts," several of which were within the statute of limitations period, which constituted a "serial violation." The Hearing Examiner explained that, although some of the discriminatory acts occurred outside of the limitations period, these acts were sufficiently related to the acts occurring within the limitations period. The Hearing Examiner concluded that these acts were not isolated, sporadic, or discrete, but part of a continuing violation.

¶40 Darinda and Anderson point out that the Final Agency Decision relied upon *Morgan v. National Railroad Passenger Corp.* (9th Cir. 2000), 232 F.3d 1008, when it concluded that a "serial violation" had occurred, and that, on appeal, the Supreme Court expressly rejected the concept of "serial violations" as a means of getting previous acts around the time bar. *National Railroad Passenger Corporation v. Morgan* (2002), 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106. We turn to an analysis of *Morgan*.

¶41 In *Morgan*, the plaintiff filed a complaint against the National Railroad Passenger Corporation ("NRPC"), alleging violations of Title VII of the Civil Rights Act of 1964, as amended in 1991. *See 42 U.S.C. § 2000e et seq.* He claimed that he suffered discrimination and retaliation and endured a hostile work environment because of his race. *Morgan*, 232 F.3d at 1010. The district court granted partial summary judgment for NRPC on the grounds that some of the alleged acts of discrimination were time-barred. *Morgan*, 232 F.3d at 1010. The U.S. Court of Appeals for the Ninth Circuit reversed, holding that Morgan had demonstrated that the alleged discriminatory acts which occurred outside the time limitation

period were nonetheless related to acts which occurred within the time limitation period and thus were part of a "continuing" or "serial" violation. *Morgan*, 232 F.3d at 1017-1018. The Ninth Circuit explained that a plaintiff can establish a continuing violation in one of two ways: by showing a series of related discriminatory acts that are not isolated, sporadic, or discrete, one or more of which are within the limitations period; or by showing a systematic policy or practice of discrimination that operated, in part, within the limitations period. *Morgan*, 232 F.3d at 1015.

¶42 On appeal, the U.S. Supreme Court affirmed in part and reversed in part, holding that Title VII precludes recovery for discrete acts of discrimination or retaliation that occur outside the statutory time limit, but that consideration of the entire scope of a hostile work environment claim, including behavior alleged to have occurred outside the statutory time period, is permissible so long as any act contributing to the hostile environment occurs within the statutory time period. *Morgan*, 536 U.S. at 105, 122 S.Ct. at 2068, 153 L.Ed.2d at 117.

¶43 Darinda and Anderson correctly note that the Supreme Court overruled the "continuing" or "serial" violation theory. In doing so, the Court explained, "Discrete acts, such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify," and that a complainant may only file a charge to cover "discrete acts" that occurred within the actionable time period. *Morgan*, 536 U.S. at 114, 122 S.Ct. at 2061, 153 L.Ed.2d at 122. However, the Court went on to explain, "A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful

14

employment practice.'" *Morgan*, 536 U.S. at 117, 122 S.Ct. at 2074, 153 L.Ed.2d at 124

(quoting 42 U.S.C. § 2000e-5(e)(1)). The court stated,

> It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.

*Morgan*, 536 U.S. at 117, 122 S.Ct. at 2074, 153 L.Ed.2d at 124. Nor, the court explained,

does it matter if some time elapses between the earlier and latter occurrences, "so long as

each act is part of the whole," even if the employee knows that on a specific, earlier day an

actionable claim occurred. *Morgan*, 536 U.S. at 118, 122 S.Ct. at 2075, 153 L.Ed.2d at 125.

¶44    Applying *Morgan* here, we examine whether the sexual assault was considered by the

Hearing Examiner to be the *sole act* of discrimination, or whether the claim is more properly

characterized as a hostile work environment claim. As Darinda and Anderson point out, the

Hearing Examiner concluded, "A sufficiently intrusive unwelcome single incident of sexual

harassment can create a hostile work environment." *See Richardson v. New York State Dept.*

*of Corr. Serv.* (2d Cir. 1999), 180 F.3d 426, 437; *Lockard v. Pizza Hut, Inc.* (10th Cir. 1998),

162 F.3d 1062, 1072; *DiCenso v. Cisneros* (7th Cir. 1996), 96 F.3d 1004, 1008. However,

and significantly, the Hearing Examiner went on to conclude that Anderson's conduct after

the 1998 Christmas party achieved the "extreme degree of offensiveness" necessary to

establish a hostile work environment, and that Darinda illegally discriminated against

Benjamin by relying upon and supporting Anderson and failing to investigate or rectify the

situation from December 1998 through March 29,1999.

15

¶45    Notably, the Hearing Examiner found that from the 1998 Christmas party until Benjamin's termination, "Anderson engaged in a continuous course of conduct aimed at exploiting Benjamin, sexually harassing her and preventing her from taking any effective action to render him accountable for his conduct. . . ." Additionally, the Hearing Examiner found that Anderson, Darinda, and Michael "engaged in a continuous course of conduct aimed at avoiding any investigation or action regarding Anderson's conduct toward Benjamin, and thereby permitted him to continue to harass her." The Hearing Examiner further noted that, although Anderson did not have another opportunity to engage in similar behavior with Benjamin as he had after the Christmas party, he continued to seek surreptitious, unwelcome sexual contact with Benjamin within the work environment, and that this was a "continuing problem" until Benjamin's termination.

¶46    Applying the rationale of *Morgan*, we conclude that the Hearing Examiner did not err in characterizing Benjamin's claim as one arising out of a series of violations as opposed to one isolated and discrete act. As the U.S. Supreme Court explained in *Morgan*, 536 U.S. at 118, 122 S.Ct. at 2075, 153 L.Ed.2d at 125, the entirety of a hostile work environment claim is actionable *even though* an employee may reasonably have realized that he or she had an actionable claim at an earlier date, so long as the hostile work environment continued to a point in time that lies within the statutory time limits for filing a claim.

¶47    Because the hostile work environment continued to a point in time within the 180-day statute of limitations, the District Court did not err in concluding that Benjamin's claim was timely filed.

16

## ISSUE TWO

¶48 Did the District Court err when it concluded that sexual harassment had occurred, without making an explicit finding that the alleged sexual harassment was sufficiently severe or pervasive as to alter Benjamin's conditions of employment and create an abusive work environment?

¶49 Darinda and Anderson argue that any sexual harassment in Benjamin's case was limited to the incident between Benjamin and Anderson during the drive home after Joker's Wild's 1998 Christmas party. They claim that this incident did not occur at work and had nothing to do with Benjamin's employment at Joker's Wild, and thus the District Court erroneously upheld the HRC's affirmance of the Hearing Examiner on this issue. They further argue that the Hearing Examiner failed to find that the alleged sexual harassment of Benjamin was so severe or pervasive as to alter Benjamin's conditions of employment and create an abusive work environment, and thus the conclusion that sexual harassment had occurred at Joker's Wild is unsupported.

¶50 Darinda and Anderson claim that the District Court's decision in this case it at odds with our holding in *Beaver v. DNRC*, 2003 MT 287, 318 Mont. 35, 78 P.3d 857. In *Beaver*, a seasonal employee at the Department of Natural Resources and Conservation traveled out of town with her supervisor for what was supposed to be a day trip. *Beaver*, ¶¶ 9-10. Because they had not completed their work by day's end, they stayed in a motel overnight, and shared a room because the supervisor informed Beaver that it was the only room available. *Beaver*, ¶ 11. During the night, her supervisor sexually assaulted Beaver. *Beaver*,

¶ 15. Beaver filed a claim with the HRC, and later initiated a lawsuit in which she alleged that she was ultimately given a less favorable seasonal position in retaliation for filing a complaint with the HRC. *Beaver*, ¶ 23.

¶51 In *Beaver*, we affirmed the District Court's holding that Beaver could not prevail on her claim of discrimination on the basis of a hostile work environment, because she failed to prove that the single incident of sexual harassment, which took place away from the normal workplace, was so severe or pervasive as to alter the conditions of her employment and thus create an abusive working environment. *Beaver*, ¶ 25. Darinda and Anderson argue that, as in *Beaver*, although Benjamin was the victim of a sexual assault, that single act occurred away from the workplace and thus is not sufficient to establish a claim of sexual harassment.

¶52 Darinda and Anderson fail to acknowledge the critical distinction between *Beaver* and the case at hand--the employers' responses upon learning of the sexual assault allegations. In *Beaver*, from the moment that Beaver reported the assault to her assailant's direct supervisor, she had no more contact with her assailant. *Beaver*, ¶ 18. He was immediately suspended without pay. *Beaver*, ¶ 18. The management recommended his termination, and he resigned shortly thereafter, while still on suspension. *Beaver*, ¶ 18. The District Court noted that the assailant's conduct was an isolated incident and there was no evidence of prior sexual offenses in the department by him or by anyone else. *Beaver*, ¶ 32. Thus, as the District Court noted, the department took immediate action to protect Beaver and to prevent further misconduct by her supervisor. *Beaver*, ¶ 32. This is in marked contrast to

18

Benjamin's situation, in which no disciplinary action was ever taken against Anderson and Anderson continued to supervise Benjamin even after Darinda, Michael, and Dick were made aware of the incident following the 1998 Christmas party. In further contrast to the situation in *Beaver*, here there had been at least one prior reported incident of sexual harassment at Joker's Wild in the months before the Christmas party, and Joker's Wild had no sexual harassment policy in place.

¶53    In *Beaver*, we relied in part upon *Harris v. Forklift Systems, Inc.* (1993), 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295, in which the U.S. Supreme Court concluded that the correct legal standard to be applied in determining whether an environment is "hostile" or "abusive" is to view the totality of the circumstances. These circumstances may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is also relevant in determining whether the employee actually found the environment abusive. *Beaver*, ¶ 42 (quoting *Harris*, 510 U.S. at 23, 114 S.Ct. at 371, 126 L.Ed.2d at 302-03).

¶54    Here, as the District Court noted,

> the culpable acts of continuing discrimination in the work place primarily took the form of the employer's failure to seriously and adequately investigate and discipline Jerry Anderson following the assault and the employer's subsequent failure to protect Nina [Benjamin] on the job. Rather, the Hearing Examiner found that the employer continued to let Jerry supervise Nina on the job and began collecting and even creating evidence against Nina in an attempt to justify firing Nina for poor work habits, when in fact the employer's motive was to avoid legal problems arising from Jerry Anderson's illegal sexual

19

behavior toward Nina that could interfere with a one and a half million dollar purchase of the business and state gaming and liquor licenses. . . .

¶55 Having established that such findings exist, we turn to the record to determine whether these findings are supported by substantial credible evidence. *Total Mechanical*, ¶ 22. It is important to note that our standard is not whether there is evidence to support findings *different* from those made by the trier of fact, but whether substantial credible evidence supports the trier's findings. *Taylor v. State Compensation Ins. Fund* (1996), 275 Mont. 432, 440, 913 P.2d 1242, 1246 (citations omitted). Arguably, there was evidence to support Darinda's and Anderson's assertions. However, there was also substantial credible evidence at the contested case hearing to support the findings made by the Hearing Examiner. Thus, these findings should not be disturbed. Nor do we conclude that the Hearing Examiner or HRC misapprehended the effect of this evidence, or that a mistake has been make. *Total Mechanical*, ¶ 22.

¶56 Finally, we consider whether the District Court erred as a matter of law when it upheld the HRC's conclusions. We view the totality of the circumstances to determine whether a work environment is "hostile" or "abusive." *Beaver*, ¶ 42. Given the totality of the circumstances described above, we conclude that the legal conclusion that the work environment was "hostile" and "abusive" was supported by the evidence. Therefore, we conclude the District Court did not err in upholding the findings and conclusions of the Final Agency Decision.

**ISSUE THREE**

20

¶57    Did the District Court err when it upheld damages for lost wages?

¶58    Darinda and Anderson next argue that the District Court erroneously upheld the award of backpay and frontpay to Benjamin because Benjamin did not demonstrate that she was terminated from Joker's Wild because of sex discrimination. Darinda and Anderson assert that "all of the evidence" demonstrates that Benjamin was terminated because of poor job performance.

¶59    Again, we will not re-weigh the evidence. There exists in the record substantial credible evidence to support the conclusion that Benjamin was terminated because of illegal discrimination and not because of poor work performance. Thus, the District Court did not err in upholding this portion of the agency's decision.

## ISSUE FOUR

¶60    Did the District Court err when it concluded that Benjamin's wage loss recovery should not be reduced for failure to mitigate?

¶61    Darinda and Anderson argue that the Hearing Examiner erred by concluding that Benjamin's delay in returning to work was reasonable under the circumstances. Darinda and Anderson claim there is no evidence to support such a conclusion, and that Benjamin's own testimony contradicts the Hearing Examiner's finding that her delay in seeking employment was due to her "debilitated emotional condition." Although Benjamin alleged in her testimony that she did not seek employment after her termination because she had lost her self-confidence, she had stated in an earlier deposition that she did not immediately seek employment because she traveled with her new husband, Bud Benjamin, and assisted her

21

daughter with wedding preparations, and then was busy setting up her new household in Seattle once she and Bud relocated there.

¶62     In a claim for lost wages before the HRC, a claimant must take reasonable steps to mitigate his or her damages. *Hulett v. Bozeman School Dist. No. 7* (1987), 228 Mont. 71, 73, 740 P.2d 1132, 1134. This standard has been defined as a duty to do what an ordinarily prudent person would do under the circumstances. *Hulett*, 228 Mont. at 73, 740 P.2d at 1134 (citation omitted). Once a complainant has established a *prima facie* case of discrimination and established the amount of her damages resulting from this discrimination, the burden then shifts to the defendant to prove by clear and convincing evidence that a lesser amount is proper. *P.W. Berry Co., Inc. v. Freese* (1989), 239 Mont. 183, 187, 779 P.2d 521, 523-24 (citations omitted). In the Final Agency Decision, the Hearing Examiner concluded that Darinda and Anderson did not meet this burden, noting that Benjamin was not obligated to seek out all possible employment opportunities, but needed only to be reasonable in pursuing offers of employment, as we noted in *Hulett*.

¶63     While Darinda and Anderson dispute that Benjamin's "debilitated emotional condition" was, in fact, the reason why she did not immediately seek new employment, they do not dispute that Benjamin was emotionally debilitated. Although they are correct that some testimony supports their assertion, our review of the record likewise reveals that substantial credible evidence--including medical testimony as well as Benjamin's own testimony concerning her loss of confidence in herself and her anxiety and reluctance to meet new people--also supports the Hearing Examiner's findings. As long as the Hearing

22

Examiner's findings are supported by substantial credible evidence, we will not disturb them. Thus, we affirm the District Court in its refusal to do so.

## ISSUE FIVE

¶64 Did the District Court err when it re-imposed the Hearing Examiner's award for emotional distress, and refused to strike the award of damages altogether?

¶65 Darinda and Anderson argue that the District Court erred by reimposing the Hearing Examiner's award of $75,000 as compensation for emotional distress, after the HRC reduced it to $40,000, because it is the HRC and not the Hearing Examiner who has the authority to set the amount of compensatory damages. However, they also maintain it was error for the HRC to award *any* compensatory damages because Benjamin's claim was based upon a diagnosis of Post-Traumatic Stress Disorder ("PTSD"), and that diagnosis was based upon Benjamin's claim that she had been sexually assaulted by Anderson after the 1998 Christmas party. Darinda and Anderson claim that no evidence exists that Benjamin suffered emotional distress from any incident concerning Joker's Wild *other than* the sexual assault, and since the sexual assault occurred more than 180 days before she filed her complaint, her recovery of damages as a result of the assault is time-barred.

¶66 Benjamin responds that the District Court was correct to affirm the award of emotional distress damages in the Final Agency Decision and reverse the HRC's reduction, because it was an error of law for the HRC to substitute its judgment for that of the agency. *See Moran*, 270 Mont. at 51, 889 P.2d at 1187 (an agency's reversal of a hearing examiner's findings cannot survive judicial review unless the court determines as a matter of law that

23

the hearing examiner's findings are not supported by substantial evidence). She further responds that the evidence showed that her emotional distress did not occur merely as a result of the sexual assault, but rather occurred as a result of a combination of the assault and the subsequent adverse actions by Anderson and the rest of the Joker's Wild management.

¶67 Benjamin suffered from sleep disturbances, low energy, lack of motivation and initiative, inability to experience pleasure or interest in things, cessation of her usual activities, apathy, guilt, shame, a decline in self-esteem, lack of self-confidence, memory difficulties, concentration difficulties, and weight gain. She further experienced nightmares and flashbacks to the assault after the Christmas party, and to Anderson's subsequent conduct toward her at work. She testified that she has experienced substantial anxiety, feels unable to trust people, and has distanced herself from others. After she relocated with Bud to the State of Washington, Benjamin sought psychiatric care and therapy once Bud's new health insurance coverage became available. She was ultimately diagnosed with PTSD.

¶68 After citing evidence presented by Benjamin and two of her mental health care providers, the District Court noted that the defendants did not present any evidence to rebut their testimony. Because the HRC did not cite any evidence to support its decision to reduce the amount of the emotional distress award, aside from the vague feeling of some Commissioners that it was too high, the District Court concluded that, although the HRC does have the statutory authority to reduce an award, this reduction was arbitrary and thus the HRC abused its discretion. The court then reinstated the Hearing Examiner's award of $75,000.

24

¶69 Notably, in the Final Agency Decision, the Hearing Examiner found that Benjamin developed clinical depression and PTSD as a result of Anderson's and Darinda's continuing conduct toward her from December 1998 through March 29, 1999. The Hearing Examiner further found that her PTSD symptoms were aggravated by her employer's hostile treatment of her and her subsequent termination, and that this in turn caused her deepening and enduring depression. The Hearing Examiner concluded that Benjamin proved that she suffered severe emotional distress because of Anderson's and Darinda's continuing conduct, and that such distress is compensable. The Hearing Examiner further concluded that Benjamin developed serious psychological problems *after she lost her job* because of the failure of Joker's Wild's owners and management to address the sexual assault and their continuing course of discriminatory conduct against Benjamin.

¶70 In human rights cases, compensatory damages may be awarded for humiliation and emotional distress established by testimony or inferred from the circumstances. *Vortex Fishing Systems, Inc. v. Foss*, 2001 MT 312, ¶ 33, 308 Mont. 8, ¶ 33, 38 P.3d 836, ¶ 33 (citing *Johnson v. Hale* (9th Cir. 1991), 940 F.2d 1192, 1193). While Darinda and Anderson argue that the Hearing Examiner based the entirety of the emotional distress claim on the December 1998 assault, the Hearing Examiner's findings indicate otherwise. Furthermore, Darinda and Anderson provide no support for their contention that the Hearing Examiner does not have the authority to award compensatory damages. Our review of the record shows that the Hearing Examiner's findings are supported by the testimony of Benjamin, her

25

expert witnesses, and others, and that the HRC's reduction of the Hearing Examiner's award of damages was arbitrary. Thus, we affirm the District Court on this Issue.

**ISSUE SIX**

¶71 Did the District Court err when it concluded that Dick was not the employer or an agent of the employer of Benjamin?

¶72 Benjamin cross-appeals the dismissal of Richard "Dick" Williams from this lawsuit and argues that the District Court erred when it upheld that portion of the Final Agency Decision which concluded Dick did not illegally discriminate against Benjamin. She claims Dick was involved in every important decision made concerning Joker's Wild from December 1998 through March 1999. She points out that he had continuous general authority to conduct business on behalf of Joker's Wild and participated directly in the establishment's key personnel actions, including its handling of all complaints of sexual harassment and the decision not to investigate Anderson's alleged harassment of Benjamin. Benjamin further claims that Dick played a "key role" in her firing.

¶73 The Hearing Examiner found that during Benjamin's employment at Joker's Wild, Dick was an active adviser to Darinda, Michael, and Anderson, who relied upon Dick's expertise in personnel matters, including dealing with complaints of sexual harassment. The Hearing Examiner further found that Dick held an ownership interest in the name "Joker's Wild," that he had held an ownership interest in three casinos other than Joker's Wild since 1998, and that he acted as an adviser and consultant to two other casinos which were owned by members of his family. The Hearing Examiner noted, "Darinda Williams made no

ownership decisions of import regarding Joker's Wild without consultation with her husband [Dick]." The Hearing Examiner also found that "Dick Williams had authority to conduct business for Joker's Wild with or without consulting with Darinda Williams."

¶74 The Hearing Examiner further noted that in two other sexual harassment incidents at Joker's Wild, the victim sought help from Dick rather than reporting the matter to Darinda, Michael, or Anderson. Darinda testified that she believed that any employees that had problems at Joker's Wild would talk to her, Anderson, Michael, or Dick. However, the Hearing Examiner found that it was Mike and Darinda who reviewed surveillance tapes of Benjamin's shifts, Mike who spoke to Benjamin about failing to provide service to a customer, and Mike who terminated Benjamin's employment. The Hearing Examiner also found that it was the continuing course of conduct by *Anderson and Darinda* that led to her discharge, emotional distress, and subsequent losses.

¶75 Ultimately, the Hearing Examiner concluded that Dick's conduct and apparent authority was not sufficient to render him a co-owner or operator of Joker's Wild, nor was he acting as Darinda's agent. Thus, the Hearing Examiner concluded that Dick was entitled to dismissal from this suit.

¶76 The Human Rights Commission affirmed Dick's dismissal without comment. The District Court noted that Benjamin's contention that Darinda did not make any significant decisions involving Joker's Wild without first conferring with Dick, and that Dick furthermore had the authority to make decisions and conduct business on behalf of Joker's Wild without conferring with Darinda was supported by the record. However, the court

27

further explained that, while the record contained credible evidence that Dick was actively involved in legal and business decisions and activities involving Joker's Wild, there was nonetheless credible evidence to support the contention that Darinda frequently consulted with Dick not because he was an "owner," but because he was experienced in the liquor and gaming industry. The District Court concluded that it would not overrule the conclusion of the Hearing Examiner and the Human Rights Commission that Dick was not a *de facto* owner of Joker's Wild because this conclusion was supported by substantial credible evidence.

¶77    We conclude that the District Court did not err in upholding the Hearing Examiner's conclusion that Dick was properly dismissed as a party defendant. As we have already explained in ¶ 55 of this Opinion, we will not disturb findings made by a Hearing Examiner so long as substantial credible evidence supports those findings. Such evidence exists here. Thus, we affirm the District Court on this Issue.

## CONCLUSION

¶78    For the above-stated reasons, we affirm the Order of the District Court.

/S/ PATRICIA O. COTTER

We Concur:

/S/ JOHN WARNER
/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART

Justice Jim Rice dissenting.

¶79     I respectfully dissent.

¶80     Under Issue 1, I believe the United States Supreme Court's holding in *Morgan* requires this case be reversed and remanded for further proceedings.

¶81     The Court disagrees with the Appellants' assertion that the sexual assault incident formed the basis of the Hearing Examiner's decision, believing it is more accurate to state that the incident was itself sufficient to constitute sexual discrimination, but that even more discrimination followed thereafter. *See* ¶ 38. Even if that assessment was correct, however, it would not alter the mandatory application of the statute of limitations to the assault incident as a "discrete act." As the Court said in *Morgan*, "discrete discriminatory acts are not actionable if time barred, *even when they are related to acts alleged in timely filed charges*. Each discrete discriminatory act starts a new clock for filing charges alleging that act." *Morgan*, 536 U.S. at 113, 122 S.Ct. at 2072, 153 L.Ed.2d at 122 (emphasis added). Here, the time clock began running for the assault incident in December of 1998 and ran 180 days later, prior to the filing of Benjamin's complaint.

¶82     Discussing Morgan's argument (similar to the one Respondent advances here) that he had suffered multiple acts that constituted one "unlawful employment practice" under Title VII, the Court stated that "[t]here is simply no indication that the term 'practice' converts related discrete acts into a single unlawful practice for the purposes of timely filing. . . . We have repeatedly interpreted the term 'practice' to apply to a discrete act or single 'occurrence,' even when it has a connection to other acts." *Morgan*, 536 U.S. at 111, 122

30

S.Ct. at 2071, 153 L.Ed.2d at 120-21. The Court then specifically *reversed* the holding of the Ninth Circuit Court of Appeals which had concluded that "so long as one act falls within the charge filing period, discriminatory and retaliatory acts that are plausibly or sufficiently related to that act may also be considered for the purposes of liability." *Morgan*, 536 U.S. at 114, 122 S.Ct. at 2072, 153 L.Ed.2d at 122. Thus, I believe our Court errs today by similarly concluding that "so long as each act is part of the whole," quoting *Morgan*, a claim may include a time-barred discrete incident. *See* ¶ 43. The Court errs by relying on this *Morgan* quote because the quote was referring to hostile environment claims wherein all the incidents were *non-discrete* in nature. *See Morgan*, 536 U.S. at 118, 122 S.Ct. at 2075, 153 L.Ed.2d at 125.

¶83    It is not disputed that the sexual assault incident was a discrete act, which the Hearing Examiner found "was extremely severe and sufficiently intrusive and unwelcome" on its own to create a hostile work environment. ("Discrete acts . . . are easy to identify. Each incident of discrimination . . . constitutes a separate actionable 'unlawful employment practice.'" *Morgan*, 536 U.S. at 114, 122 S.Ct. at 2073, 153 L.Ed.2d at 122.) However, the Hearing Examiner erred by attempting to submerge this discrete incident into the claim as a whole for purposes of the statute of limitations: "The acts of discrimination occurring outside of the limitations period–the original acts of sexual harassment by Anderson . . .–were sufficiently related to those occurring within the limitations period . . . ." In my view, the District Court and this Court make the same error.

¶84    *Morgan* clarified, however, that *evidence* of such time-barred discrete incidents are admissible to support an otherwise timely claim:

> The existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed. *Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim*.

*Morgan*, 536 U.S. at 113, 122 S.Ct. at 2072, 153 L.Ed.2d at 122 (emphasis added).

¶85    The decision of the HRC was heavily premised on a discrete incident which was time-barred.  A claim cannot be made for that incident.  I would reverse and remand for further proceedings in which the incident could not be part of the claim, but about which evidence could be introduced in support of remaining claims.

/S/ JIM RICE