DA 13-0149

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2014 MT 1

THE ESTATE OF ROSS WELCH,

      Petitioner and Appellant,

  v.

HOLCIM, INC., and MONTANA HUMAN
RIGHTS COMMISSION,

      Respondents and Appellees.

| | |
|---|---|
| APPEAL FROM: | District Court of the Eighteenth Judicial District, In and For the County of Gallatin, Cause No. DV 11-403C Honorable John C. Brown, Presiding Judge |

COUNSEL OF RECORD:

      For Appellant:

      Stephen C. Pohl; Attorney at Law; Bozeman, Montana

      For Appellees:

      Thomas Hattersley, III, Teri A. Walter; Gough, Shanahan, Johnson & Waterman, PLLP; Helena, Montana (for Holcim, Inc.)

      Timothy Charles Little; Human Rights Bureau; Helena, Montana (for Montana Human Rights Commission)

              Submitted on Briefs: November 20, 2013
                       Decided: January 7, 2014

Filed:

_____
                  Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1    The estate of petitioner Ross Welch (Welch) appeals the Eighteenth Judicial District Court's order affirming the decision of the Montana Human Rights Commission (Commission), which upheld the Montana Department of Labor and Industry's dismissal of Welch's discrimination complaint. Although many issues were raised, we find the following issue dispositive: Whether the District Court erred in affirming the Hearing Officer's determination that Welch did not prove that he belonged to a protected class. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2    In 2004, Holcim hired Welch as a production supervisor for its cement manufacturing plant in Trident, Montana. Production supervisors work twelve-hour rotating shifts, alternately working the day shift and the night shift. Welch was a competent employee, though he found the position stressful because he was responsible for making decisions that affected the safety of other employees.

¶3    In April 2008, Welch went to the emergency room for chest pains. Welch was treated by a cardiologist, Dr. Mehrle, who diagnosed him with angina, a heart condition. Dr. Mehrle advised him not to return to work. Welch contacted Val Aughney, Holcim's human resources administrator for the Trident facility, and explained his condition. Aughney advised Welch to contact Holcim's claims administrator, CIGNA Group Insurance.

¶4    CIGNA administered Welch's claim for short-term disability benefits. Catherine Novak, a claims administrator with CIGNA, sent a letter approving Welch's claim for short-term disability benefits for the period of April 4, 2008, to May, 1, 2008, and informing Welch of his obligation to provide certain necessary medical information to ensure his continued eligibility for benefits. The short-term disability plan entitled Welch to 180 days of disability benefits that could be revoked if he was terminated, returned to work, or was no longer considered totally disabled.

¶5    Several Holcim employees believed that Welch overstated the severity of his condition by representing that he had a "leaking valve," a "hole" in his heart, and that he was "being seen in Billings by somebody for angioplasty" even though he did not undergo angioplasty. Welch denied that he overstated his condition and said that he told Novak that his stress caused him chest pain and a "valve leak." Welch also told Novak that he did not have other employment, despite that he worked part-time for Headwaters Livestock while receiving disability payments.

¶6    Holcim began inquiring whether Welch's treating physicians would release him to perform a temporary light-duty job that Holcim created to accommodate Welch's restrictions until he could return to his former position. Anticipating that Welch would continue to work while he was recovering, Holcim prepared the light-duty dayshift job for Welch involving tasks normally divided among numerous Holcim employees.

¶7    After the initial approval of the short-term benefits, CIGNA struggled in communicating with Welch's doctors. When Welch's doctors did provide CIGNA with

information about Welch, Welch's cardiologist and his psychologist provided what CIGNA believed to be inconsistent information regarding Welch's restrictions and return to work status. Dr. Mehrle initially estimated that Welch could return to work by July 15, 2008, with no heavy exertion or night shifts. Dr. Mehrle later told Novak that while Welch was "released for light duty, sedentary work, and day shifts," he "should not return to his former job." Dr. Murphey, Welch's psychologist, communicated to CIGNA on June 12, 2008, that Welch could return to work if the position was part-time, "did not have supervisory responsibilities," and did not involve "demands from supervisors." Dr. Murphey then wrote a letter on June 18, 2008, stating that Welch should not return to work even with restrictions.

¶8 CIGNA also had difficulty contacting Welch to obtain the additional medical information required for continued approval of his short-term disability benefits claim. Welch admitted to failing to respond to phone calls from Holcim. By mid-June, CIGNA still remained unclear regarding Welch's medical condition and whether he could return to work.

¶9 During this time, Welch communicated to Dr. Murphey that he felt "burned out," that he was "stressed out" by his position as production supervisor, that he was "struggling with feelings of guilt about deciding not to go back to work," and that he was considering "taking over his father-in-law's business." Welch was "increasingly clear that [he] cannot and will not return to Holcim."

4

¶10    On June 25, 2008, Holcim learned from CIGNA that Welch was restricted permanently from working on the night shift.  This restriction would permanently prevent him from working his production supervisor job.  Two days later, Aughney spoke with Welch by telephone, explaining that the permanent restriction against working the night shift prevented him from ever returning to his old position and that Holcim could not change its offer of a temporary day shift job to a permanent position.

¶11    Aughney was uncertain how to handle the situation with Welch, given that Holcim was holding his position open despite that he was now unable to return to it.  On July 2, 2008, Welch called Aughney and explained that his doctor would not change his now permanent restrictions.  He asked her to figure out what vacation was due, arrange for his final check, and fill out the termination paperwork.

¶12    Later that day, Aughney asked Pat Lane, Holcim's manager of employee and labor relations, if requesting Welch's resignation would be "out of line?"  Lane responded, "I think a request for a resignation letter is appropriate.  We continue to have his job and he can't return to the job so resignation would be in order."  Aughney agreed to request a resignation letter from Welch when he came in to fill out his termination paperwork the following day.

¶13    The parties dispute how Welch left Holcim.  Holcim argues that Welch resigned when he met with Aughney on July 3, 2008.  During that meeting, he told her that he was "done," and that she should "cut [him] a check."  Welch argues that he was constructively discharged because Aughney explained that Holcim would not offer him

the temporary light-duty position it had created once it became clear that Welch could not return to his production supervisor position. The parties agree that Welch refused to sign a resignation letter.

¶14    Welch filed a claim under the Montana Human Rights Act (Human Rights Act), and the Department of Labor's appointed hearing officer scheduled a hearing. At the hearing, undisputed evidence demonstrated that Welch had no intention of ever returning to work at Holcim. Welch testified that he told Dr. Murphey, "I had had enough of the job" and "couldn't work with" coworker Mike Mullaney. He didn't "trust" his fellow employees at Holcim. Additionally, Welch felt "very angry and resentful" about Holcim's inquiries regarding whether he could return to work; he also blamed Holcim for the breakdown of his marriage. While Welch was on disability leave from his position at Holcim, Welch worked for two other employers: Headwaters Livestock and Topp's Custom Crates. While he pursued his claim against Holcim, Welch contacted and applied for positions with other employers. The positions about which he inquired included two production supervisor positions and a night production supervisor position.

¶15    The Hearing Officer found that Welch did overstate the severity of his condition to Holcim and to CIGNA. The Officer found that the conflicting reports from Welch's doctors, Welch's poor communication with Holcim, and the lack of definitive answers from CIGNA caused Holcim considerable frustration and confusion regarding Welch's condition and return to work status. The Officer found that reports of Welch playing golf while on disability leave added to Holcim's confusion regarding whether Welch was fit

6

to return to work. Finally, the Hearing Officer found that the facts cumulatively demonstrated that Welch was not discharged, but instead that he resigned from Holcim.

¶16 The Hearing Officer ultimately concluded that "Holcim did not discriminate against Welch on the basis of disability." Welch filed an objection with the Commission, which issued an order dated March 16, 2011, concluding that the Department of Labor did not abuse its discretion and overruling Welch's objection. Welch appealed to the District Court, which also affirmed the findings and conclusions of the Hearing Officer. On February 21, 2013, Welch appealed the decision of the District Court. Welch died while his appeal was pending and his estate was substituted in his place.

**STANDARD OF REVIEW**

¶17 On appeal of a district court's ruling on a contested case affirmed by the Commission, "we review findings of fact for clear error and conclusions of law for correctness." *Baxter Homeowners Assn. v. Angel*, 2013 MT 83, ¶ 11, 369 Mont. 398, 298 P.3d 1145. "This Court gives deference to interpretations of the Montana Human Rights Commission concerning the laws [that] it enforces." *Martinell v. Mont. Power Co.*, 268 Mont. 292, 302, 886 P.2d 421, 428 (1994).

¶18 On a petition for judicial review of a decision by the Commission, "[t]he court may not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact." Section 2-4-704(2), MCA. A reviewing court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are, in relevant part:

(i) in violation of constitutional or statutory provisions; . . .
(iv) affected by other error of law;
(v) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; [or]
(vi) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion . . . .

Section 2-4-704(2), MCA.

¶19   "A three-part test is used to determine whether agency findings are clearly erroneous:   (1) the record is reviewed to determine if the findings are supported by substantial evidence; (2) if the findings are supported by substantial evidence, it will be determined whether the agency misapprehended the effect of the evidence; and (3) if substantial evidence exists and the effect of the evidence has not been misapprehended, the reviewing court may still decide that a finding is clearly erroneous if a review of the record leaves the court with a definite and firm conviction that a mistake has been made." *Benjamin v. Anderson*, 2005 MT 123, ¶ 31, 327 Mont. 173, 112 P.3d 1039.

## DISCUSSION

¶20   The Human Rights Act prohibits discrimination against employees on the basis of a physical or mental disability.   Section 49-2-303(1)(a), MCA.   To recover under the Human Rights Act, the petitioner is first required to prove that he belonged to a protected class. *Reeves v. Dairy Queen*, 1998 MT 13, ¶¶ 10-19, 287 Mont. 196, 953 P.2d 703.   To qualify as a member of a protected class under the Human Rights Act on the basis of a physical or mental disability, Welch must show that he has "(i) a physical or mental impairment that substantially limits one or more of a person's major life activities; (ii) a record of such an impairment; or (iii) a condition regarded as such an impairment."

8

Section 49-2-101(19)(a), MCA. The determination of whether a person is disabled must be made on a case-by-case basis. *Reeves*, ¶¶ 23-28. This Court relies on applicable federal law in addition to its own in construing Montana's discrimination laws. *BNSF Ry. Co. v. Feit*, 2012 MT 147, ¶ 9, 365 Mont. 359, 281 P.3d 225.[1]

¶21 Under the first subsection of the definition of physical or mental impairment, the petitioner must prove that a physical or mental impairment "substantially limits one or more of [the petitioner's] major life activities." Section 49-2-101(19)(a)(i), MCA. "Major life activities" include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, working, writing, and mobility." *McDonald v. Dept. of Env. Quality*, 2009 MT 209, ¶ 39, 351 Mont. 243, 214 P.3d 749; Admin. R. M. 2.21.1427(2). Work is a major life activity. *McDonald*, ¶ 39 (citing Admin. R. M. 2.21.1427(2); 29 C.F.R. § 1630.2(i)). A person is also substantially limited if he or she "experiences difficulty in securing, retaining, or advancing in employment" because of a physical or mental impairment. *Martinell*, 268 Mont. at 308, 886 P.2d at 430.

¶22 Similar to the federal regulations, we construe the term "substantially limits" broadly in favor of expansive coverage. *See Butterfield v. Sidney Pub. Schs.*, 2001 MT 177, ¶ 23, 306 Mont. 179, 32 P.3d 1243; 29 C.F.R. at § 1630.2(j)(i). To qualify as substantially limited in the major life activity of work, a person must be "significantly

---

[1] The Americans With Disabilities Act, after which Montana's laws are patterned (*Feit*, ¶ 8), was amended by the ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008) (ADAAA). The ADAAA took effect on January 1, 2009, and has been held not to apply retroactively. *Becerril v. Pima County Assessor's Office*, 587 F.3d 1162, 1164 (9th Cir. 2009). Because Welch's employment ended on July 3, 2008, we do not consider the ADAAA here.

restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities." *Butterfield*, ¶ 21; 29 C.F.R. at § 1630.2(j)(ii) ("An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section.").

¶23 Welch conceded that he was not, in a general sense, substantially limited from major life activities. He testified that he continued to golf, camp, hike, and otherwise exercise while he received disability payments. Welch argued, however, that his medical condition precluded him from working the night shift. He maintains that this Court has held categorically that "an employee restricted from working night shifts is disqualified from a 'class of jobs' and therefore disabled," citing to our decision in *Martinell*.

¶24 *Martinell* involved a woman suffering from endometriosis. She took medication for her condition that caused her to become depressed and compelled her to miss a significant amount of work. Her condition persisted for three years. *Martinell*, 268 Mont. at 298-300, 886 P.2d at 425-26. The district court found—and this Court agreed— that the record indicated that her condition gave her considerable difficulty in retaining and advancing her employment. *Martinell*, 268 Mont. at 307, 886 P.2d at 430.

¶25 In contrast to Martinell, Welch apparently had no trouble securing other employment. Welch worked cleaning livestock pens and at his father-in-law's business during and after his disability leave. Welch applied for many other jobs. While Welch maintained that he was barred from a broad range of jobs, he simultaneously sought positions at other plants that were substantially similar to his job at Holcim—including positions with rotating night shifts. By March 2009, Welch had accepted a position in a warehouse with a new employer.

¶26 The Hearing Officer found that "at most [Welch] was prevented by his impairment only from a single job—production supervisor with a night-time rotating shift requirement." The Hearing Officer based his determination on evidence showing that Welch's restriction from working the night shift was brought about by the stress that he felt because of the nature of his specific position with Holcim and his relationship with his particular coworkers. The restrictions placed on Welch by his doctors were created in the context of whether Welch could return to work at his current job for Holcim. The Hearing Officer determined that Welch was not substantially limited in his ability to work because his particular restriction from working the night shift was not from a class of jobs or a broad range of jobs.

¶27 The Hearing Officer's findings that Welch was not substantially limited in his ability to work and that "Welch's diagnosis of angina has not affected any major life activity" were supported by the evidence. Welch has not demonstrated clear error in the

11

Hearing Officer's finding that he was not substantially limited in one or more major life activities and thus did not belong to a protected class under § 49-2-101(19)(a)(i), MCA.

¶28    In the alternative, Welch argues that even if he did not prove that he was "substantially limited" under the Human Rights Act, he belonged to a protected class because Holcim regarded him as disabled pursuant to § 49-2-101(19)(a)(iii), MCA.  An individual who does not show that he is substantially limited within the meaning of § 49-2-101(19)(a)(i), MCA, may still be entitled to the protections of the Human Rights Act if he can show that his employer regards him as restricted in the ability to perform the basic functions of his own job.  *Butterfield*, ¶ 32.

¶29    We identified a limit to the scope of § 49-2-101(19)(a)(iii), MCA, however, when we stated that "[a]n employer does not necessarily regard an employee as handicapped simply by finding the employee incapable of satisfying the demands of a particular job." *Hafner v. Conoco, Inc.*, 268 Mont. 396, 402, 886 P.2d 947, 951 (1994).  We clarified that "an employer regards an employee as handicapped in his or her ability to work by finding the employee's impairment to foreclose generally the type of employment involved." *Hafner*, 268 Mont. at 402, 886 P.2d at 951.

¶30    In *Hafner*, we held that the district court erred when it determined that the employee was not regarded as physically disabled by his employer because the employer's personnel director testified that he regarded the employee as "restricted . . . in basic job functions that would limit his performance of work or could limit his performance of work." *Hafner*, 268 Mont. at 403, 886 P.2d at 951.  Similarly, in

12

*Butterfield*, we reversed because the district court's conclusion that the employer did not regard the employee as disabled was contradicted by the hearing examiner's findings that the employer considered the employee to be "restricted in his ability to do heavy lifting." *Butterfield*, ¶ 32. In *Adamson*, however, we affirmed that an employee was not disabled where the hearing examiner "merely determined that [the employee's] return could endanger either [the employee] or [the employee's] coworkers," but "never concluded that [the employee's] condition precluded him from performing a class of jobs." *Adamson v. Pondera Co.*, 2004 MT 27, ¶ 29, 319 Mont. 378, 84 P.3d 1048. *See also Walton v. U. S. Marshals Serv.*, 492 F.3d 998, 1009 (9th Cir. 2007), *cert. denied*, 552 U.S. 1097 (2008) ("An allegation that the employer regards the impairment as precluding the employee from a single, particular position is insufficient to support a claim that the employer regards the employee as having a substantially limiting impairment.").

¶31 Welch admits that "[b]oth the hearing officer and the District Court adopted Holcim's argument that it did not regard Welch as disabled because it only considered him to be restricted in the specific job of production supervisor." Welch would have us reconsider this factual finding based on our holding in *Butterfield*. In *Butterfield*, however, we concluded that the petitioner met his burden only after noting that the hearing examiner found that he was "significantly restricted in the ability to perform that class of jobs which requires heavy physical labor, or at least that his employer regarded him as so restricted." *Butterfield*, ¶ 19. Here, the hearing officer made the opposite finding with regard to whether Welch met his burden: that Welch's condition was

13

brought about by stressors caused by his specific job and he was not prevented from working a broad range or class of jobs as required by the Human Rights Act.

¶32 Welch further argues that Holcim regarded him as disabled because Holcim constructively terminated him when his restriction from working his rotating night shift became permanent. He alleges that his termination proves that Holcim believed that he could not perform his job. On this issue, Welch's appeal relies heavily on perceived mistakes of the Hearing Officer in making factual determinations.

¶33 Of particular relevance is the Hearing Officer's determination that Welch resigned from Holcim instead of being discharged. The Hearing Officer found that "Holcim did not make the determination that Welch could not perform 'basic job functions.'" The Officer found instead that Welch determined that he could not do the production supervisor job when he "resigned of his own accord." "A hearing examiner, when one is used, is in the unique position of hearing and observing all testimony entered in the case. . . . The findings of the hearing examiner, especially as to witness credibility, are therefore entitled to great deference." *Benjamin*, ¶ 37.

¶34 The evidence supports the finding that Holcim did not regard Welch as disabled within the meaning of the statute. First, the lack of communication with Holcim by Welch appears to have made it difficult for Holcim to make any independent determination about Welch's condition at all. The employer was confused about Welch's ability to work and accordingly deferred to CIGNA, Welch's doctor, and Welch's own reports about his restrictions. Holcim appropriately created a temporary position for

14

Welch during this time, anticipating that he would be able to return to his position as Production Supervisor. Second, once Holcim became aware that Welch's medical restrictions were permanent, Welch resigned before Holcim could make any determination regarding his condition. Ultimately, it was Welch, not Holcim, who decided that he could not meet the demands of his job.

¶35 Upon review of the record, we conclude that the evidence here supports the Hearing Officer's findings that Welch's condition, notwithstanding the restrictions it imposed, was brought about by stress caused by his specific position at this particular cement plant and thus did not substantially limit his ability to work in a class of jobs generally. The evidence also supports the finding that Holcim did not regard Welch as disabled. The Hearing Officer did not err in concluding that Welch's restriction from working the night shift of his production supervisor job did not entitle Welch to the protections of the Human Rights Act because the facts presented here do not satisfy the requirements of § 49-2-101(19)(a), MCA.

¶36 Our standard is not whether there is evidence to support findings different from those made by the Hearing Officer, but whether substantial credible evidence supports the findings. *Benjamin*, ¶ 55. While arguably evidence existed to support Welch's assertions, there also was substantial credible evidence presented to support the findings made by the Hearing Officer. The Hearing Officer did not misapprehend the effect of the evidence, and we are not convinced that a mistake has been made. Thus, we affirm the conclusion that Holcim did not discriminate against Welch on the basis of disability.

¶37 Because Welch did not establish that he was a member of a protected class, he failed to prove the threshold element of a discrimination claim. Therefore, we do not consider his argument that Holcim failed to accommodate his disability. We also need not consider the remaining issues he raises on appeal.

## CONCLUSION

¶38 The District Court properly affirmed the Commission's order upholding the Hearing Officer's determination that Welch was not disabled within the meaning of the Human Rights Act. Its judgment is affirmed.


/S/ BETH BAKER

We concur:

/S/ MIKE McGRATH
/S/ PATRICIA COTTER
/S/ MICHAEL E WHEAT
/S/ JIM RICE